# IN THE SUPREME COURT OF TEXAS

═══════════
No. 17-0628
═══════════

S&S EMERGENCY TRAINING SOLUTIONS, INC.
D/B/A EMERGENCY MEDICAL TRAINING SERVICES, PETITIONER,

v.

SHEILA ELLIOTT, RESPONDENT

═══════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS
═══════════════════════════════════════════

**Argued October 11, 2018**

JUSTICE JOHNSON delivered the opinion of the Court.

S&S Emergency Training Solutions, Inc. d/b/a Emergency Medical Training Services (EMTS) sued a former employee for breaching nondisclosure agreements she signed in connection with her employment. The employee, Sheila Elliott, responded in part with a motion to dismiss under the Texas Citizens Participation Act (TCPA). TEX. CIV. PRAC. & REM. CODE § 27.003. The question is whether, in response to Elliott's motion to dismiss, EMTS provided clear and specific evidence of a prima facie case that she breached the agreements. The trial court answered "yes;" the court of appeals answered "no." Because we agree with the trial court that the answer is "yes," we reverse the judgment of the court of appeals and remand to the trial court for further proceedings.

## I. Background

EMTS provides courses and training for emergency medical service providers. One of its courses qualified students to take the National Registry of Emergency Medical Technicians Exam, which is the test required to become a licensed paramedic. A paramedic education program such as that offered by EMTS must be nationally accredited for its graduates to be eligible to take the exam. A program may receive accreditation from an institution accrediting agency recognized by the U.S. Department of Education or through a consortium agreement with an entity that has already been accredited. 25 TEX. ADMIN. CODE § 157.32(f) (2017) (Tex. Dep't of State Health Servs., Emergency Medical Services Education Program and Course Approval); Comm'n on Accreditation of Allied Health Educ. Programs (CAAHEP), Standards & Guidelines for the Accreditation of Educational Programs in the Emergency Medical Services Professions 2–3 (2015), https://www.caahep.org/CAAHEP/media/CAAHEP-Documents/EMSPStandards2015.pdf. To fulfill the accreditation requirement, EMTS entered into a consortium agreement with Arlington Career Institute (ACI), an accredited institution.

In April 2013, EMTS contracted with Elliot for her to be its program director. As program director, Elliott would have access to information EMTS considered to be confidential. Thus, EMTS required her to sign nondisclosure agreements (NDAs). In 2014, Elliott signed an NDA to which both EMTS and ACI were parties. The NDA provided that Elliott would not use or disclose processes, information, records, or specifications of the consortium except in the course of her employment and for the benefit of the consortium. In 2015, Elliott signed another, similar, NDA to which EMTS and ACI were parties. In December 2015, Elliott wrote a letter to EMTS's CEO,

Thomas Cellio III, requesting a raise. She claimed that as program director she had kept EMTS "running smooth and profitable." The day after she sent the letter she resigned.

After she resigned, Elliott filed complaints with the Texas Department of State Health Services in which she alleged that EMTS engaged in unlawful business practices. She sent copies of her complaints to ACI's CEO, Jon Vecchio, and notified potential employers of EMTS's graduates, such as police and fire departments, of her pending allegations. Elliott also communicated these allegations to some current and former EMTS students, and publicized this information on the internet. Following Elliott's actions, ACI withdrew from the consortium agreement with EMTS.

EMTS sued Elliott for breach of contract and moved for injunctive relief. It claimed she violated the NDAs by disclosing confidential information covered by the agreements. The trial court granted EMTS's motion and enjoined Elliott from disclosing EMTS's confidential information. Elliott responded with a motion to dismiss pursuant to the TCPA in which she contended that her actions were an exercise of her right to petition and her right of free speech. She maintained that the matters about which she communicated related to the training of emergency medical personnel, which is a matter of public concern. EMTS countered that Elliott contractually agreed to forgo her rights of free speech and petition as to confidential information covered by the NDAs. In the alternative, EMTS argued that it provided clear and specific evidence of a prima facie case of breach of contract, thus it was entitled to maintain its suit. The trial court denied Elliott's motion to dismiss without explanation. Elliott filed an interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(12).

3

The court of appeals reversed and remanded with instructions to the trial court to dismiss the suit and award attorney's fees to Elliott. ___ S.W.3d ___, ___ (Tex. App.—Dallas 2017). The court noted that if the TCPA is invoked, reviewing a suit such as EMTS's entails a two-step analysis. *Id.* at ___. The first step requires determining whether the defendant established that the plaintiff's suit was in response to the defendant's having exercised her constitutional right to free speech, petition, or association. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(b). If the defendant establishes that she did, then the second step requires the plaintiff to establish a prima facie case of each essential element of its claim by clear and specific evidence. *See id.* § 27.005(c). The court of appeals concluded that Elliott was exercising her right to free speech because her communications touched on matters of public concern. ___ S.W.3d at ___. It rejected EMTS's argument that Elliott could not satisfy the first step of the TCPA process because she had given up the rights on which that process would be based when she entered into the NDAs. *Id.* It did so on the basis that the NDAs were relevant to the second step of the process, but not to the first step. *Id.* (citing *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015)). The appeals court then turned its analysis to the second step of the TCPA inquiry: did EMTS meet its burden of establishing, by clear and specific evidence, a prima facie case for its breach of contract claim? *Id.* at ___. The court of appeals determined that EMTS established all the elements of a breach of contract claim except that EMTS did not show the disclosures caused it to suffer damages. *Id.* at ___.

In this Court, EMTS contends that the court of appeals applied an erroneous standard regarding the damages element of its claim—the court measured the evidence by whether EMTS produced evidence of the specific *amount* of damages the disclosures caused instead of properly determining whether EMTS produced prima facie evidence that the disclosures simply caused it

4

*some* damages. EMTS argues that it met the proper standard by providing evidence that ACI terminated the consortium agreement in response to Elliott's disclosures, which in turn caused EMTS to be unable to conduct its profitable paramedic courses. Alternatively, EMTS asserts that it established a prima facie case for specific performance and injunctive relief by clear and specific evidence. EMTS references evidence that it claims shows Elliott's disclosures caused ACI to terminate the consortium agreement it had with EMTS, and thus demonstrated imminent harm, irreparable injury, and lack of an adequate legal remedy.

Elliott argues that the court of appeals applied the correct standard, which requires more than the generalized, conclusory testimony of EMTS's CEO on which EMTS relies. Elliott also argues that EMTS's evidence failed to show that the courses it could no longer offer yielded a net profit. As to EMTS's argument regarding nonmonetary relief, Elliott maintains that EMTS failed to preserve error, and even if it preserved error, it did not present a prima facie case of the essential elements of those claims.

## II. Law

When a party asserts that claims in a suit against it are "based on, relate[] to, or [are] in response to" its exercise of certain constitutional rights, then it may move for dismissal under the TCPA. TEX. CIV. PRAC. & REM. CODE § 27.003(a). If such a movant establishes by a preponderance of the evidence that the suit "is based on, relates to, or is in response to the party's exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association," the case shall be dismissed unless the nonmovant "establishes by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005. In determining whether

5

such motions to dismiss should be granted, courts are to consider the pleadings and supporting and opposing affidavits on which the claim or defense is based. *Id.* § 27.006(a).

The nonmovant's evidence of a prima facie case must be "clear and specific" in order to avoid dismissal, *id.* § 27.005(c), although the statute does not define "clear and specific." In *Lipsky*, we referenced "clear" as meaning "'unambiguous,' 'sure,' or 'free from doubt,'" and "specific" as "'explicit' or 'relating to a particular named thing.'" 460 S.W.3d at 590. We also determined that "prima facie case" as used in the statute means evidence that is legally sufficient to establish a claim as factually true if it is not countered. *Id.* In other words, a prima facie case is the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Id.* Direct evidence of damages is not required, but the evidence must be sufficient to allow a rational inference that some damages naturally flowed from the defendant's conduct. *See id.* at 591, 592; *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1099 (Tex. 1938) ("A party who breaks his contract cannot escape liability because it is impossible to state or prove a perfect measure of damages.").

Appellate review of issues regarding interpretation of the TCPA is de novo. *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018).

### III. Analysis

As noted above, neither party contests the court of appeals' determination that EMTS sued Elliott in response to her exercise of free speech. *See* TEX. CIV. PRAC. & REM. CODE § 27.003; ___ S.W.3d at ___. Thus, we focus on the second step of the analysis regarding the TCPA: whether EMTS established by clear and specific evidence a prima facie case of each essential element of its breach-of-contract claim. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018) (a breach of contract action requires proof of four elements: (1) formation of a valid contract;

6

(2) performance by the plaintiff; (3) breach by the defendant; and (4) "the plaintiff sustained damages as a result of the breach"). The court of appeals concluded that EMTS's evidence was sufficient except for causation and damages. ___ S.W.3d at ___. The only challenge here is to the court of appeals' evidentiary ruling regarding causation and damages.

Elliott claims that EMTS did not establish that it was damaged by the disclosures causing it to lose profits. In considering that claim, we note that EMTS was not required to provide evidence sufficient to allow an exact calculation of the lost profits. *See Owen*, 115 S.W.2d at 1098. Rather, it was only required to present evidence sufficient to support a rational inference that Elliott's actions caused it to lose *some* specific, demonstrable profits. *See Lipsky*, 460 S.W.3d at 592–93.

EMTS attached affidavits of ACI's CEO Jon Vecchio and Cellio to its response to Elliott's TCPA Motion. In his affidavit, Vecchio stated that EMTS and ACI were required to enter into the Consortium Agreement for EMTS to be accredited and offer approved paramedic training courses. According to Vecchio's affidavit, ACI terminated the agreement "[i]n large part due to Elliott's disclosures of information protected by the NDAs." Cellio averred that the consortium agreement was necessary for EMTS to comply with regulatory guidelines and qualify to offer the paramedic training classes. He also stated in the affidavit that because of EMTS's loss of ACI as a consortium partner, EMTS could no longer offer paramedic training courses to new students.

In an affidavit filed in support of her motion to dismiss, Elliott acknowledged that under the consortium agreement, EMTS conducted approximately ten paramedic training classes of thirty students each and that each student paid tuition of $4,950. She also acknowledged that, "[w]ithout a consortium agreement, EMTS was not going to be able to offer future Paramedic courses." A letter Elliott wrote while she was the program director and in which she asked for a raise was

7

attached as an exhibit to Cellio's affidavit, which was in turn attached to EMTS's Brief in Support of its Application for Ex Parte Temporary Restraining Order and Application for Temporary Injunction. In the letter, Elliott stated that when she worked there EMTS was "running smooth and [was] profitable."

Elliott's pre-resignation letter and the affidavits of Vecchio and Cellio support, at minimum, rational inferences that (1) EMTS's paramedic classes were profitable before Elliott's disclosures of confidential information; (2) the disclosures were a cause of ACI's terminating the consortium agreement; and (3) termination of the consortium agreement caused EMTS to lose the ability to conduct the profitable paramedic training classes. *See id.* at 590. Thus, EMTS provided prima facie evidence that Elliott's disclosures caused EMTS to lose profits. That evidence was sufficient to preclude dismissal of EMTS's suit. *See id.* at 593; *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 465 (Tex. App.—Dallas 1988), *writ denied*, 778 S.W.2d 865 (Tex. 1989) (per curiam).

The court of appeals analogized the evidence in this case to the "general averments" of pecuniary loss and lost profits that failed to establish prima facie damages in *Lipsky*. ___ S.W.3d at ___; *see* 460 S.W.3d at 593. But EMTS's pleadings and the record here reflect more than was present in *Lipsky*. This record demonstrates that EMTS's lost revenues were susceptible to calculation with reasonable certainty based on data regarding what classes were provided under the consortium agreement and how much revenue EMTS was taking in per student. Moreover, Elliott managed the program and stated in her December 2015 letter that EMTS was "profitable," not that it simply had students. The trial court could have reasonably inferred that as program director she had personal knowledge of both revenues and expenses, and thus whether EMTS's operation was

8

profitable. *See* TEX. CIV. PRAC. & REM. CODE § 27.006(a)(courts must consider "the pleadings and supporting and opposing affidavits" forming the basis for the claim).

The court of appeals also stated that EMTS "did not attempt to explain how any damages might have been the natural, probable, and foreseeable result of Elliott's disclosures." ___S.W.3d at ___. In *Lipsky*, we determined that the plaintiff's affidavit was too uncertain to meet the TCPA threshold for a prima facie case. *See* 460 S.W.3d at 593. There the plaintiff averred that it had suffered economic harm, but did not set out specific facts showing how the defendant's conduct caused the harm. *See id.* Here, in contrast, EMTS provided Vecchio's affidavit in which he specifically related termination of the consortium agreement to Elliott's breach of the NDAs.

Elliott argues that EMTS cannot establish a prima facie case because a simple loss of revenue is not enough to show damages. This argument stems from *Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, in which the court held that a business's showing of declining general revenue in the wake of a negative review from BBB is not sufficient evidence for the damages element of a tortious interference claim where the TCPA is involved. 441 S.W.3d 345, 361 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). As noted above, however, the evidence in the record here went beyond demonstrating revenues. The content of Elliott's December 2015 letter evidenced the fact that EMTS's classes were profitable, given her position as program director.

Elliott further argues that EMTS could have, but did not, satisfy its burden by demonstrating a decline from its pre-breach revenues and course bookings to its post-breach revenues and course bookings in the same way the plaintiffs did in *Moldovan v. Polito*. No. 05-15-01052, 2016 WL 4131890, *10–11 (Tex. App.—Dallas Aug. 2, 2016, no pet.) (mem. op.) (photographer showed approximately $180,000 in revenues and seventy-five bookings a year in months before defamatory

9

statement and $38,000 in revenues and two bookings in the six months after the statement). However, *Polito* is consistent with our conclusion in this case. The record contains evidence of EMTS's revenues before Elliott's disclosures, the number of classes it offered, and the approximate number of students enrolled in each class. There is no dispute that after her disclosures caused ACI to withdraw from the consortium agreement, EMTS was unable to continue the paramedic training courses.

Lastly, Elliott claims that the court of appeals should not be faulted for failing to consider the evidence in Elliott's affidavit and pre-resignation letter because EMTS did not specifically point out this evidence to either the trial court or the court of appeals. But the referenced evidence was in pleadings and affidavits that were before the trial court, and which the TCPA required the trial court to consider in determining whether to dismiss Elliott's case. *See* TEX. CIV. PRAC. & REM. CODE § 27.006(a) ("In determining whether a legal action should be dismissed under this chapter, the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based."). Further, the precise arguments regarding the causation and damages elements of EMTS's breach of contract cause of action did not arise until parsed out by the court of appeals. In her appellant's brief there, Elliott mentioned EMTS's failure to establish a prima facie case for breach of contract, but did not specifically argue that EMTS failed to demonstrate that Elliott's actions caused it to lose profits. After the court of appeals concluded that EMTS failed to establish profitability and thus failed to establish that Elliott caused it to suffer damages, EMTS filed a motion for rehearing and pointed to Elliott's pre-resignation letter originally filed as part of the Cellio affidavit in the trial court. When the matter complained of originates with the court of appeals' opinion and judgment, it can be raised in a motion for rehearing there or a

10

petition for review in this Court. *See* TEX. R. APP. P. 53.2(f); *G.T. Leach Builders, LLC v. Sapphire V.P., L.P.*, 458 S.W.3d 502, 517–18 (Tex. 2015). EMTS did both.

Because, in response to Elliott's TCPA motion to dismiss, EMTS established a prima facie case by clear and specific evidence of each essential element of a breach of contract cause of action, we need not address whether EMTS established a prima facie case of entitlement to injunctive relief or specific performance.

## IV.  Conclusion

The court of appeals erred by dismissing EMTS's suit. We reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

_____
Phil Johnson
Justice

**OPINION DELIVERED:** December 21, 2018

11