Opinion filed December 19, 2019



## In The

# Eleventh Court of Appeals

_____

## No. 11-19-00217-CV

_____

## STALLION OILFIELD SERVICES LTD. AND MICHAEL BROWN, Appellants

## V.

## GRAVITY OILFIELD SERVICES, LLC, Appellee

**On Appeal from the 385th District Court**
**Midland County, Texas**
**Trial Court Cause No. CV55423**

### O P I N I O N

This suit arises from Michael Brown's decision to resign from his employment with Gravity Oilfield Services, LLC and accept employment with Stallion Oilfield Services Ltd., one of Gravity's direct competitors. Gravity sued and alleged that Brown breached a noncompete, nondisclosure, and nonsolicitation agreement and that Stallion tortiously interfered with that agreement when it hired Brown. Appellants filed a motion to dismiss Gravity's claims pursuant to the Texas Citizens Participation Act, TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–.011

(West 2015) (the TCPA).[1] The trial court denied the motion to dismiss, found that the motion was frivolous and intended to delay, and awarded Gravity the reasonable attorney's fees that it incurred to respond to the motion.

In their first two issues, Appellants assert that the trial court erred when it denied the motion to dismiss (1) because Appellants established that the TCPA applies to Gravity's claims and (2) because Gravity failed to establish by clear and specific evidence a prima facie case for each essential element of the claims. In two additional issues, Appellants challenge the trial court's award of attorney's fees to Gravity and failure to award attorney's fees and sanctions to them. We affirm that portion of the trial court's order in which it denied Appellants' motion to dismiss, but reverse that portion of the trial court's order in which it awarded attorney's fees to Gravity.

*Background*

Gravity is an oilfield service company that assists its customers "in running their oil wells continuously." Among other services, Gravity's Power Generation and Rental Solutions division rents natural gas power generators to customers. According to Chad Wolf, Vice President, Power Generation and Rental Solutions, Gravity "pioneered the natural gas power generator rental market in the Permian [B]asin" and spent six years and over $120 million to develop the specifications and "add on products" for its natural gas power generators as well as the market for the generators.

---

[1]The Texas legislature amended the TCPA effective September 1, 2019. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 1–9, 12 (H.B. 2730) (to be codified at TEX. CIV. PRAC & REM CODE ANN. §§ 27.001, .003, .005–.007, .0075, .009–.010). Because the underlying lawsuit was filed prior to September 1, 2019, the law in effect before September 1 applies. *See id.* §§ 11–12. For convenience, all citations to the TCPA in this opinion are to the version of the statute prior to September 1, 2019. *See* Act of May 21, 2011, 82d Leg., R.S., ch. 341, § 2, 2011 Tex. Gen. Laws 961–64, amended by Act of May 24, 2013, 83d Leg., R.S., ch. 1042, 2013 Tex. Gen. Laws 2499–2500.

Gravity's predecessor, Light Tower Rentals, Ltd., hired Brown in March 2007. Light Tower Rentals, Ltd. became Light Tower Rentals, Inc. in January 2008 and, in turn, Light Tower Rentals, Inc. became Light Tower Rentals, LLC in February 2017 (the three Light Tower Rentals entities are referred to collectively as LTR). While employed by LTR, Brown was promoted from Shop Foreman, to Regional Manager Northeast, to Corporate Maintenance Manager, and finally to Product Line Manager of Contracted Generation Services.

At LTR, Brown was involved in writing the policy governing the maintenance of engine-driven equipment. Brown interfaced with customers about the rental of the generators and worked with vendors and other employees of LTR to develop and improve the line of natural gas power generators that LTR rented to its customers. Brown also contributed to the development of an electrical maintenance panel that allowed a generator to be taken out of service without interrupting the operation of other generators that were attached to it.

In 2016, LTR Group Holdings LLC (LTRGH) was the indirect corporate parent of LTR.[2] Through a December 23, 2016 Unit Option Agreement (the 2016 Agreement), LTRGH awarded Brown an option to acquire Class C Units in LTRGH. The 2016 Agreement was subject to LTRGH's 2016 Incentive Equity Plan (the 2016 Plan) and incorporated the definitions in the 2016 Plan. As relevant here, the 2016 Plan defined a "subsidiary" of LTRGH as an entity that was owned or controlled, directly or indirectly, by LTRGH, one or more of LTRGH's subsidiaries, or a combination thereof.

In the 2016 Agreement, Brown agreed to certain nondisclosure, noncompete, and nonsolicitation provisions. As relevant here, Brown generally agreed (1) that he would not disclose or use for his or another person's benefit the confidential

---

[2] In 2016, LTRGH owned 100% of LTR Investco, Inc., which owned 100% of LTR Holdco, Inc., which owned 100% of LTR.

3

information of LTRGH, its subsidiaries, or its affiliates; (2) that he would not work for a competitor of LTRGH, its subsidiaries, or its affiliates for a period of one year after the termination of his employment; and (3) that, for a period of one year after the termination of his employment, he would not solicit suppliers, customers, or "other business relation[s]" of LTRGH, its subsidiaries, or its affiliates to cease doing business with those companies. Brown also agreed that, if he breached the 2016 Agreement, "[LTRGH] or any of its Subsidiaries shall have the right to enforce" the restrictive covenants. Brown and LTRGH's Chief Financial Officer, Keith Muncy, signed the 2016 Agreement.

Beginning in 2016, LTR was part of a major corporate restructuring. In "early" 2017, LTRI Holdings, LP and LTRGH merged, and LTRI Holdings acquired a majority of the voting equity securities in LTRGH, such that LTR became a subsidiary of LTRI Holdings. The merger plan provided that any outstanding option issued pursuant to the 2016 Plan would be converted into an option to purchase units in LTRI Holdings without any action by the holder of the option. Therefore, Brown's option to purchase common units of LTRGH was converted into an option to purchase common units in LTRI Holdings.

On January 30, 2017, Brown signed a "[LTRGH] 2016 Incentive Equity Plan Participant Acknowledgment and Consent." Brown "acknowledge[d] and agree[d]" that, pursuant to the merger plan, his option to purchase units in LTRGH issued pursuant to the 2016 Plan would be converted into an option to purchase units in LTRI Holdings pursuant to LTRI Holdings' 2017 Incentive Equity Plan (the 2017 Plan). The acknowledgement and consent provided that "[t]he LTRI Holdings Option shall be subject to the same terms and conditions, including as to vesting, as were applicable to" the LTRGH option. Brown "consent[ed] to the foregoing terms and accept[ed]" the LTRI Holdings option.

4

Attached to the Acknowledgement and Consent was a Unit Option Agreement Pursuant to the 2017 Plan (the 2017 Agreement). The 2017 Agreement acknowledges that Brown's option to purchase units in LTRGH had been converted into an option to purchase units in LTRI Holdings and that the option to purchase units of LTRI Holdings was subject to "the following terms and conditions." Those "terms and conditions" include the same restrictive covenants as in the 2016 Agreement. The 2017 Agreement was subject to the 2017 Plan and incorporated the definitions in the 2017 Plan. The definition of "subsidiary" in the 2017 Plan is identical to the definition in the 2016 Plan.

In March 2018, LTR and other entities merged with Globe Energy Services, LLC. The surviving entity was renamed Gravity Oilfield Services, LLC. After March 26, 2018, Brown was employed by Gravity as the Director of Power Services for its Power Generation and Rental Solutions division. Brown had the same responsibilities at Gravity as he had had as the Product Line Manager of Contracted Generation Services at LTR.

In August 2018, Stallion approached Brown about possible employment in a new division that would rent natural gas power generators to oil and gas customers. Stallion wanted Brown to develop a division that would provide the same services within the same industry for the same types of customers as Gravity did. Because Brown believed that the 2017 Agreement contained restrictions on his activities if he terminated his employment with Gravity, he provided a copy of that agreement to Stallion. Stallion forwarded the 2017 Agreement to its counsel for review.

Brown subsequently questioned Gravity's in-house counsel about whether Gravity had "actively pursued" any employee who had left the company and, based on that discussion, informed Stallion that Gravity did not have a history of enforcing covenants not to compete. Brown also informed Stallion that he did not believe that Stallion would "take enough market share during the 1st year to constitute any action

against Stallion." Based on that information, Stallion "reevaluate[d] the risk assessment" of hiring Brown. Stallion ultimately offered Brown the position of Director of Power Solutions.

On November 16, 2018, Brown submitted his resignation to Gravity. Even though he specifically represented to Gravity that he had not made a decision about his future employment, Brown had already accepted employment with Stallion. Brown began working for Stallion in early December. In January 2019, Stallion purchased ten of the same model of natural gas power generators used by Gravity from one of Gravity's vendors. Stallion also ordered additional generators from another of Gravity's vendors and requested that the vendor install a control panel on the generators that was very similar to the panel that Brown helped develop at Gravity.

Over the next several months, Brown had discussions with potential customers for Stallion's natural gas power generators. Some of these companies were Gravity's customers. In April 2019, one of Gravity's customers replaced two natural gas power generators rented from Gravity with two natural gas power generators rented from Stallion.

After it learned that Brown was involved in starting a division at Stallion to rent natural gas power generators, Gravity advised Stallion of Brown's noncompete agreement and asked that Stallion "cease utilizing" Brown in any manner that violated the terms of the noncompete agreement. After Stallion failed to respond, Gravity sued Brown for breach of the 2016 Agreement and Stallion for tortiously interfering with that agreement. Appellants filed a motion to dismiss Gravity's claims pursuant to the TCPA. Gravity amended its petition and alleged that Brown breached both the 2016 and the 2017 Agreements and that Stallion tortiously interfered with both agreements. Gravity also filed a lengthy response to the motion to dismiss.

The trial court denied Appellants' motion to dismiss without specifying the basis for its ruling. It also found that the motion was frivolous and intended for delay, awarded Gravity the attorney's fees and costs that it incurred to respond to the motion, and ordered Gravity's attorney to file an affidavit of the attorney's fees incurred.

*The TCPA*

The TCPA protects citizens from retaliatory lawsuits meant to intimidate or silence them on matters of public concern. *Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 376 (Tex. 2019); *In re Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015) (orig. proceeding). The stated purpose of the TCPA is to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." CIV. PRAC. & REM. § 27.002; *see also ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017) (per curiam). We construe the TCPA "liberally to effectuate its purpose and intent fully." CIV. PRAC. & REM. § 27.011(b); *see also State ex rel. Best v. Harper*, 562 S.W.3d 1, 11 (Tex. 2018).

The TCPA provides a procedure to expedite the dismissal of a "legal action" that appears to stifle the nonmovant's exercise of the rights protected by the statute. *Youngkin v. Hines*, 546 S.W.3d 675, 679 (Tex. 2018); *see also* CIV. PRAC. & REM. §§ 27.003(a), .005(b). The movant bears the initial burden to show by a preponderance of the evidence that the legal action is based on, related to, or in response to the movant's exercise of the right of free speech, the right of association, or the right to petition. CIV. PRAC. & REM. §§ 27.003(a), .005(b); *Youngkin*, 546 S.W.3d at 679. If the movant makes this showing, the burden shifts to the nonmovant to establish by clear and specific evidence a prima facie case for each essential element of the claim in question. CIV. PRAC. & REM. § 27.005(c);

*Youngkin*, 546 S.W.3d at 679. Even when the nonmovant satisfies this burden, the trial court must dismiss the legal action if the movant "establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." CIV. PRAC. & REM. § 27.005(d); *see also Youngkin*, 546 S.W.3d at 679–80.

We review de novo whether the parties satisfied their respective burdens as set out in the TCPA. *Hall*, 579 S.W.3d at 377. When we conduct this review, we consider the pleadings and the supporting evidence in the light most favorable to the nonmovant. *ETC Tex. Pipeline, Ltd. v. Addison Exploration & Dev., LLC*, 582 S.W.3d 823, 832 (Tex. App.—Eastland 2019, pet. filed); *Robert B. James, DDS, Inc. v. Elkins*, 553 S.W.3d 596, 603 (Tex. App.—San Antonio 2018, pet. denied); *see also* CIV. PRAC. & REM. § 27.006(a).

*Analysis*

In their first two issues, Appellants assert that the trial court erred when it denied the motion to dismiss because (1) Gravity's claims for breach of contract and tortious interference with contract are based on or related to Appellants' exercise of the right of association and the right of free speech and (2) Gravity failed to establish with clear and specific evidence a prima facie case for each essential element of the claims. Gravity responds that Appellants failed to carry their burden to establish that the TCPA applies to Gravity's claims because the TCPA is preempted by the Texas Covenant Not to Compete Act, TEX. BUS. & COM. CODE ANN. §§ 15.50–.52 (West 2011) (the CNCA), and because the exercise of the right of association or the right of free speech is not implicated when two parties work together to breach contractual obligations and tortiously inflict harm. Gravity further argues that, even if the TCPA applies to its claims, it established by clear and specific evidence a prima facie case for each essential element of the claims. Because we agree with Gravity that it established a prima facie case for each essential element of its claims,

8

we will assume without deciding that the TCPA applies to Gravity's claims. *See Schlumberger Ltd. v. Rutherford*, 472 S.W.3d 881, 891 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (assuming that the TCPA applied in its determination of whether the trial court erred when it denied a motion to dismiss).

*Prima Facie Case*

Gravity, as the nonmovant, was required to establish by clear and specific evidence a prima facie case for each essential element of its claims for breach of contract and tortious interference. A prima facie case "refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *Lipsky*, 460 S.W.3d at 590. It is "the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *Hall*, 579 S.W.3d at 376–77 (quoting *KBMT Operating Co. v. Toledo*, 492 S.W.3d 710, 721 (Tex. 2016)).

The term "clear and specific" refers to the "quality of evidence required to establish a prima facie case." *Serafine v. Blunt*, 466 S.W.3d 352, 358 (Tex. App.—Austin 2015, no pet.). The TCPA's requirement of "clear and specific evidence" means that the nonmovant "'must provide enough detail to show the factual basis for it claim' and must provide enough evidence 'to support a rational inference that the allegation of fact is true.'" *Hall*, 579 S.W.3d at 377 (quoting *Lipsky*, 460 S.W.3d at 590–91); *see also* CIV. PRAC. & REM. § 27.005(c). The TCPA, however, "does not impose a higher burden of proof than that required of the plaintiff at trial." *Lipsky*, 460 S.W.3d at 591. Further, the nonmovant may rely on circumstantial evidence, which is simply indirect evidence that creates an inference to establish a central fact, unless "the connection between the fact and the inference is too weak to be of help in deciding the case." *Lipsky*, 460 S.W.3d at 588–89; *see also Hall*, 579 S.W.3d at 377.

The essential elements of Gravity's breach-of-contract claim against Brown are (1) that a valid contract exists, (2) that Gravity performed or tendered

performance, (3) that Brown breached the terms of the contract, and (4) that Gravity sustained damages as a result of the breach. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018). The essential elements of Gravity's tortious-interference-with-contract claim against Stallion are (1) that there is an existing contract subject to interference, (2) that Stallion committed a willful and intentional act of interference with the contract, and (3) that Stallion's act proximately caused actual damages or loss to Gravity. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). Appellants argue that Gravity failed to establish by clear and specific evidence a prima facie case (1) that there is an existing, enforceable contract between Gravity and Brown; (2) that Brown breached either the 2016 Agreement or the 2017 Agreement; or (3) that Gravity was damaged by Appellants' conduct.

We note that, in many of their arguments, the parties essentially request that we resolve, as a matter of law at this preliminary stage of the proceeding based on a very limited record that contains disputed facts, which party should ultimately prevail in this dispute. However, a TCPA motion to dismiss is not a trial on the merits and is not intended to replace either a trial or the summary judgment proceeding established by the Texas Rules of Civil Procedure. *See Krasnicki v. Tactical Entm't, LLC*, 583 S.W.3d 279, 284 (Tex. App.—Dallas 2019, pet. denied); *McCrary v. Hightower*, 513 S.W.3d 1, 9 n.7 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Rather, as relevant here, we consider only whether Gravity met its burden to establish a prima facie case of each essential element by clear and specific evidence. *West v. Quintanilla*, 573 S.W.3d 237, 243 n.9 (Tex. 2019); *Schlumberger*, 472 S.W.3d at 894. A determination that Gravity has met its TCPA burden does not establish that its factual allegations are true. *West*, 573 S.W.3d at 243 n.9.

*Existence of a Valid Agreement*

Appellants first argue that Gravity failed to produce sufficient evidence of an existing contract because Gravity was not a party to the 2016 Agreement and neither Gravity nor Brown was a party to the 2017 Agreement. Gravity does not dispute that it is not a signatory to either agreement, but it asserts that it has a right to enforce the restrictive covenants in the agreements as a subsidiary of LTRGH and LTRI Holdings.

"A third party may enforce a contract it did not sign when the parties to the contract entered the agreement with the clear and express intention of directly benefitting the third party." *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011); *see also Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 635 (Tex. 2018). "[T]he contracting parties must have intended to grant the third party the right to be a 'claimant' in the event of a breach." *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017). We determine whether the contracting parties intended to benefit a third party directly by looking to the contract's language, construed as a whole. *Id.*

In the 2016 Agreement, Brown agreed to restrictive covenants that benefited LTRGH and its subsidiaries. Brown also agreed that LTRGH and any of its subsidiaries would have the right to enforce the restrictive covenants in the agreement. Gravity pleaded that it has the right to enforce the restrictive covenants in the 2016 Agreement because it is a subsidiary of LTRGH. Muncy, who is Gravity's CFO and has worked for Gravity or its related companies for more than eleven years, stated that he has personal knowledge of Gravity and its predecessor entities' corporate reorganization and mergers that took place between 2016 and 2018. According to Muncy, LTR was a subsidiary of LTRGH in 2016. In March

11

2018, LTR and other entities merged with Globe Energy Services, LLC and the surviving entity was renamed Gravity.[3]

At this stage of the proceedings, we consider only whether Gravity "'provide[d] enough detail to show the factual basis for its claim' and . . . provide[d] enough evidence 'to support a rational inference that the allegation of fact is true.'" *Hall*, 579 S.W.3d at 377 (quoting *Lipsky*, 460 S.W.3d at 590–91). Viewed through this prism, we hold that Gravity established by clear and specific evidence a prima facie case that, in the 2016 Agreement, Brown and LTRGH intended to benefit LTRGH's subsidiaries by giving those subsidiaries the right to enforce the restrictive covenants in the agreement and that LTR, which is now Gravity, was a subsidiary of LTRGH at the time Brown and LTRGH signed the 2016 Agreement.

As to the 2017 Agreement, Appellants contend that, because neither LTRI Holdings nor Brown signed that agreement, there is no "agreement" for Gravity to enforce. Although neither Brown nor LTRI Holdings signed the 2017 Agreement, Brown signed the "[LTRGH] 2016 Incentive Equity Plan Participant Acknowledgment and Consent," which provided (1) that Brown's option in LTRGH would be converted into an option in LTRI Holdings pursuant to the 2017 Plan and (2) that the LTRI Holdings option would "be subject to the same terms and conditions, including as to vesting, as were applicable" to his LTRGH option. Brown consented to "the foregoing terms" and accepted the LTRI Holdings option.

Appellants argue that, by signing the Acknowledgement and Consent, Brown "simply agreed his options would continue to be governed by the 2016 Agreement." We have already held that Gravity met its TCPA burden to establish a prima facie case that it has a right to enforce the 2016 Agreement. Therefore, if Brown agreed

---

[3]Pointing to Gravity's 2018 Franchise Tax Public Information Report filed with the Texas Secretary of State, Appellants argue that Gravity is actually LTRGH's parent, not its subsidiary. Gravity asserts that the LTRGH listed on the filing is a Texas entity, not the Delaware LTRGH that executed the 2016 Agreement. As previously noted, it is not the role of this court to resolve this issue of fact at this stage in the proceedings. *West*, 573 S.W.3d 237 at 243 n.9.

12

that his LTRI Holdings option would be governed by the 2016 Agreement, then Gravity established by clear and specific evidence a prima facie case that it has the right to enforce the restrictive covenants.

Further, if the 2017 Agreement replaced the 2016 Agreement, Gravity produced evidence that Brown's LTRGH option was replaced by the LTRI Holdings option, that Brown signed the Acknowledgement and Consent in which he agreed to accept the LTRI Holdings option, and that the LTRI Holdings option was subject to the same terms and conditions as were applicable to the LTRGH option. Attached to the Acknowledgment and Consent was the 2017 Agreement. The 2017 Agreement stated that Brown's LTRGH option was "subject to the following terms and conditions." Those terms and conditions include the same restrictive covenants as in the 2016 Agreement. We hold that Gravity produced sufficient evidence to support a rational inference that Brown agreed to the restrictive covenants in the 2017 Agreement.

Finally, Gravity pleaded that it had the right to enforce the restrictive covenants in the 2017 Agreement because it was a subsidiary of LTRI Holdings. The 2017 Agreement provides that LTRI Holdings or any of its subsidiaries had the right to enforce those restrictive covenants. According to Muncy, Gravity is "controlled, directly or indirectly, by LTRI Holdings, its subsidiaries or a combination thereof."[4] Therefore, Gravity established by clear and specific evidence a prima facie case that, in the 2017 Agreement, Brown and LTRI Holdings

---

[4]Muncy specifically stated (1) that LTRI Holdings owns a majority of the Class A common stock of Gravity Oilfield Services Inc. (GOS Inc.); (2) that, because it possesses a majority of the total voting power of shares of stock entitled to vote in the election of directors of GOS Inc., LTRI Holdings has control of GOS Inc.; (3) that GOS Inc. is the managing member of Gravity Oilfield Holdings LLC (GOH); (4) that GOH is the sole member of Gravity Oilfield Operating LLC (GOO); (5) that GOO is the sole member of Gravity; and (6) that "as a result of this ownership structure, Gravity is owned or controlled, directly or indirectly, by LTRI Holdings, its subsidiaries or a combination thereof." Muncy supported these statements with the operating agreements of GOH and GOS and documents pertaining to LTRI Holdings' ownership of shares in GOS Inc.

13

intended to benefit LTRI Holdings' subsidiaries by giving those subsidiaries the right to enforce the restrictive covenants in the agreement and that Gravity is a subsidiary of LTRI Holdings.

*Breach of Restrictive Covenants*

Appellants next contend that Gravity failed to produce clear and specific evidence of a prima facie case that Brown breached either the 2016 or the 2017 Agreement because the restrictive covenants in those agreements are not in force during this litigation and because Gravity failed to sufficiently identify any confidential information that Brown has used or disclosed.

Section 7(g) of both agreements is titled "Additional Acknowledgment; Remedies." The last two sentences of Section 7(g) provide:

> The periods of time set forth in this Section 7 shall not include, and shall be deemed extended by, any time required for litigation to enforce the relevant covenant periods, provided that [LTRGH] or any of its Subsidiaries is successful on the merits in any such litigation. The "time required for litigation" is herein defined to mean the period of time from the earlier of [Brown's] first breach of such covenants or service of process upon [Brown] through the expiration of all appeals related to such litigation.

Appellants assert that Brown's conduct that forms the basis of Gravity's claims occurred during the "time required for litigation"; that the "time required for litigation" is not included in the relevant covenant periods; and that Brown, therefore, did not breach the agreements. Gravity responds that the language in Section 7(g) of the agreements is a tolling provision that prevents Appellants from "running out the one year time limitation by filing suit or delaying resolution." Appellants counter that Gravity's reading of the agreements causes "the time period of the covenant not to compete [to be] overbroad as a matter of law" because the "time required for litigation" could be indefinite.

14

The restrictive covenants in the 2016 and 2017 Agreements are not all in effect for the same time period. Specifically, pursuant to Section 7(d) of the agreements, Brown is prohibited for a period of one year following the termination of his employment from competing with LTRGH or LTRI Holdings, or the subsidiaries or affiliates of these entities, and from soliciting the customers, suppliers, and "business relations" of LTRGH or LTRI Holdings, or their subsidiaries or affiliates, to cease doing business with those companies. However, pursuant to Section 7(a) of the agreements, Brown is "perpetually" prohibited from disclosing or using "at any time" confidential information that he received from LTRGH, LTRI Holdings, or their subsidiaries or affiliates.

Pursuant to Section 7(a), Brown's agreement that he will "perpetually" not use or disclose Gravity's confidential information "at any time" necessarily means that he will not use or disclose any confidential information during the "time required for litigation." Further, there is no need to extend a "perpetual" time period while any alleged breach of the covenant is litigated. Therefore, both Sections 7(a) and 7(g) can be given effect only if the parties' agreement—that the "periods of time" in Section 7 "shall not include, and shall be deemed extended by, any time required for litigation to enforce the relevant covenant periods"—does not apply to Brown's agreement not to use or disclose Gravity's confidential information. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (noting that we must "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless"); *see also Exxon Mobil Corp. v. Ins Co. of State*, 568 S.W.3d 650, 657 (Tex. 2019).

Appellants also contend that Gravity failed to identify any confidential information that Brown used or disclosed. Appellants specifically argue that all information that Gravity alleges that Brown used or disclosed is publicly available and not confidential. Pursuant to the 2016 and the 2017 Agreements, "confidential

15

information" encompasses information regarding LTRGH's, LTRI Holdings', and their subsidiaries' "business operations, including corporate strategy, pricing and other market information, know-how, trade secrets, and valuable customer, supplier, strategic partner, licensee, licensor, lessor, regulatory and employee relationships," unless the information is obtained from a public or nonconfidential source.

Gravity produced evidence that Brown had access to "confidential information," as defined by the 2016 and 2017 Agreements, while Brown was employed at Gravity. Gravity also produced evidence that Brown did not work with natural gas power generators before he was employed by LTR and that Brown acquired knowledge of the "contracted power generation service arena" through his employment at LTR and Gravity. Further, while he was employed by LTR and Gravity, Brown interfaced with vendors, was involved in the development of the specifications for the natural gas generators that Gravity purchased, and helped develop a control panel that Gravity used on its natural gas generators. At Stallion, Brown ordered the same model of natural gas power generators that Gravity used, from the same vendors that Gravity used, with a very similar control panel as the one developed by Gravity. Finally, Gravity produced evidence that it spent $120 million over a period of six years to develop its natural gas power generator rental business while Stallion, which did not have a natural gas power generator division before it hired Brown, was able to order generators and begin renting them within four months.

We hold that this evidence was sufficient to support a rational inference that Brown learned confidential information while employed at Gravity and that he used that information to quickly start a division at Stallion that was in direct competition with Gravity. *See Univ. Plant Servs., Inc. v. Dresser-Rand Grp., Inc.*, 571 S.W.3d 346, 359 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (holding that nonmovant established a prima facie case of breach element of breach-of-contract claim by

16

producing evidence that former employees copied or e-mailed confidential information prior to resignations).  Therefore, Gravity established by clear and specific evidence a prima facie case that Brown breached the 2016 and the 2017 Agreements when he used or disclosed Gravity's confidential information for his or Stallion's benefit.[5]

*Breadth of Agreement*

Appellants also contend that, pursuant to the CNCA, Gravity cannot recover damages and cannot enforce either the 2016 or the 2017 Agreement because the covenant not to compete is overbroad as a matter of law.  Appellants specifically argue that it is impossible to ascertain the scope of the covenant not to compete and that the covenant not to compete contains an industry-wide exclusion, does not have geographic limitations, and has an indefinite time period.

We first note that the CNCA, standing alone, is not sufficient to bar Gravity's breach-of-contract and tortious-interference claims.  First, the CNCA applies only to Gravity's claims based on Brown's breach of the 2016 and the 2017 Agreements' noncompetition provisions.  *See* BUS. & COM. § 15.50(a).  Therefore, the CNCA would not prevent Gravity from recovering damages on its claims based on the breach of the nonsolicitation or nondisclosure provisions of the restrictive covenants. *See Neurodiagnositic Consultants, LLC v. Nallia*, No. 03-18-00609-CV, 2019 WL 4231232, at *7 (Tex. App.—Austin Sept. 6, 2019, no pet. h.) (mem. op.).

As to the covenant not to compete, the CNCA provides:

> [A] covenant not to compete is enforceable if it is ancillary to or part of
> an otherwise enforceable agreement at the time the agreement is made
> to the extent that it contains limitations as to time, geographical area,
> and scope of activity to be restrained that are reasonable and do not

---

[5]Because we hold that Gravity established by clear and specific evidence a prima facie case that Brown breached the 2016 and the 2017 Agreements when he used or disclosed Gravity's confidential information for his or Stallion's benefit, we need not address Appellants' arguments that the covenants not to compete and not to solicit are not in effect during the "time required for litigation."  *See* TEX. R. APP. P. 47.1.

17

impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

BUS. & COM. § 15.50(a). If a covenant not to compete that is ancillary to or part of an otherwise enforceable agreement contains limitations as to time, geographical area, or scope of activity that are unreasonable and impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee, the trial court is required to reform the covenant so that the restraints are reasonable. *Id.* § 15.51(c). A trial court may award damages, injunctive relief, or both for a breach of an enforceable covenant not to compete, but may not award damages for a breach of an overbroad covenant prior to its reformation. *Id.* § 15.51(a).

However, "Section 15.51 applies only when the issue of enforceability of the covenant is finally determined and reformation is made as part of a final remedy." *Nallia*, 2019 WL 4231232, at *7 (citing *Primary Health Physicians, P.A. v. Sarver*, 390 S.W.3d 662, 665 (Tex. App.—Dallas 2012, no pet.) (collecting cases holding that the CNCA does not preempt requirements for temporary injunctive relief and concluding that the CNCA governs only final remedies)). Therefore, whether the covenants not to compete in the 2016 and the 2017 Agreements contain reasonable restrictions under the CNCA or must be reformed following a final trial on the merits does not impact our determination of whether Gravity met its burden under the TCPA to establish by clear and specific evidence a prima facie case for each essential element of its claims. *See id.*

*Damages*

Appellants finally assert that Gravity failed to meet its burden to establish a prima facie case of causation or damages because Gravity's evidence of damages is conclusory and because Gravity offered only evidence of lost revenue, rather than lost profits.

Bare, baseless opinions are not a substitute for the clear and specific evidence required to establish a prima facie case. *Lipsky*, 460 S.W.3d at 592. Therefore, general averments of direct economic losses and lost profits, without more, does not satisfy the minimum requirements of the TCPA. *Id.* at 593. However, the nonmovant is "not required to provide evidence sufficient to allow an exact calculation" of its actual damages in order to meet its burden under the TCPA. *S & S Emergency Training Sols., Inc. v. Elliott*, 564 S.W.3d 843, 848 (Tex. 2018). Rather, the nonmovant is only required to present evidence sufficient to support a rational inference as to the existence of damages. *Id.* (concluding that nonmovant was only required to produce evidence that the movant's actions "caused it to lose *some* specific, demonstrable profits"); *Deuell v. Tex. Right to Life Comm., Inc.*, 508 S.W.3d 679, 689 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (holding nonmovant was not required to show "amount or constituent parts" of damages in a tortious interference case during TCPA portion of proceedings).

Gravity pleaded for actual damages in the form of lost profits. *See Am. Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex. 1990) ("The basic measure of actual damages for tortious interference with contract is the same as the measure of damages for breach of the contract interfered with, to put the plaintiff in the same economic position he would have been in had the contract interfered with been actually performed."). Gravity produced evidence that, in April 2019, PDC Energy, Inc. terminated its contract with Gravity for the rental of two natural gas power generators and rented two of the same model natural gas power generators from Stallion. Stallion knew when it rented the natural gas power generators to PDC that PDC was a customer of Gravity. According to Wolf, Gravity rents each of its natural gas power generators for an average of $170 per day and has seen a 10% decrease in revenue from PDC. Wolf also stated that Gravity will see increased competition for rental bids due to Brown's and Stallion's use of

Gravity's confidential information and will suffer lower profits due to lost bids or the need to decrease rental prices and profit margins in order to compete with Stallion.

Because Gravity was only required to present evidence sufficient to support a rational inference as to the existence of damages, *see Elliott*, 564 S.W.3d at 848, the fact that Wolf testified mainly as to lost revenues is not fatal at this stage of the proceedings, *Price v. Buschemeyer*, No. 12-17-00180-CV, 2018 WL 1569856, at *14 & n.10 (Tex. App.—Tyler Mar. 29, 2018, pet. denied) (mem. op.) (citing *Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 279–80 (Tex. 2016) (noting that "uncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery")). Further, evidence that the nonmovant will suffer "lost revenue and increased competition on bids" as a result of its former employees' actions is sufficient to establish a prima facie case of damages. *Universal Plant Servs.*, 571 S.W.3d at 359–60. We hold that Gravity produced evidence that, at a minimum, supported a rational inference that Gravity's contract with PDC was profitable and that Appellants' conduct caused Gravity actual damage or loss. *See Elliott*, 564 S.W.3d at 848; *Schlumberger Ltd.*, 472 S.W.3d at 894.

We overrule Appellants' second issue. Because we have concluded that Gravity met its burden under the TCPA to establish by clear and specific evidence a prima facie case of each essential element of its claims, we need not address Appellants' first issue in which they complain that the trial court erred when it determined that the TCPA does not apply to Gravity's claims. *See* Tex. R. App. P. 47.1.

*Attorney's Fees and Costs*

In their third and fourth issues, Appellants contend (1) that the trial court erred when it awarded Gravity attorney's fees and (2) that, because its motion to dismiss should have been granted, the case should be remanded to the trial court for an award

20

of attorney's fees to Appellants and the assessment of possible sanctions against Gravity.

We review the trial court's decision to award attorney's fees under the TCPA for an abuse of discretion. *Sullivan v. Tex. Ethics Comm'n*, 551 S.W.3d 848, 857 (Tex. App.—Austin 2018, pet. denied); *see also Pinghua Lei v. Nat. Polymer Int'l Corp.*, 578 S.W.3d 706, 717 (Tex. App.—Dallas 2019, no pet.). A trial court abuses its discretion when it acts arbitrarily or unreasonably or without regard to guiding principles. *Sullivan*, 551 S.W.3d at 857; *see also Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

If a trial court grants a motion to dismiss under the TCPA, it is required to award the moving party (1) court costs, reasonable attorney's fees, and other expenses incurred in defending against the action as justice and equity may require and (2) sanctions against the party who brought the legal action as the court determines sufficient to deter the party from bringing similar actions. CIV. PRAC. & REM. § 27.009(a). As discussed above, the trial court properly denied Appellants' motion to dismiss; therefore, Appellants are not entitled to an award of attorney's fees, costs, or sanctions. We overrule Appellants' fourth issue.

If the trial court finds that the motion to dismiss was frivolous or solely intended to delay, it may award costs and reasonable attorney's fees to the nonmovant. *Id.* § 27.009(b). "[A] finding that a motion to dismiss is not well taken must precede an award of the respondent's attorney's fees under Section 27.009(b)." *In re Estate of Calkins*, 580 S.W.3d 287, 300 (Tex. App.—Houston [1st Dist.] 2019, no pet.). The trial court found that Appellants' motion to dismiss was frivolous and "intended for delay" and awarded Gravity the reasonable attorney's fees that it incurred to respond to the motion. Appellants assert that the trial court abused its discretion when it awarded attorney's fees to Gravity because the trial court did not

21

find that the motion to dismiss was "*solely* intended to delay" as required by Section 27.009(b) and because the motion to dismiss has a basis in law and fact.

The TCPA first authorizes the trial court to award attorney's fees to the nonmovant if it finds that the motion to dismiss was solely intended to delay. CIV. PRAC. & REM. § 27.009(b). Although the trial court found that Appellants' motion was "intended to delay," it did not find that the motion was "solely intended to delay." In the absence of a finding that the motion to dismiss was "filed with the sole intention of delaying the proceedings," "an award of attorneys' fees is not authorized by the statute." *Sloat v. Rathbun*, 513 S.W.3d 500, 510 (Tex. App.— Austin 2015, pet. dism'd); *see also Abatecola v. 2 Savages Concrete Pumping, LLC*, No. 14-17-00678-CV, 2018 WL 3118601, at *15–16 (Tex. App.—Houston [14th Dist.] June 26, 2018, pet. denied) (mem. op.).

The trial court may also award attorney's fees to the nonmovant if it finds that the motion to dismiss was frivolous. CIV. PRAC. & REM. § 27.009(b). "Frivolous" is not defined in the TCPA. However, "the word's common understanding contemplates that a claim or motion will be considered frivolous if it has no basis in law or fact and lacks a legal basis or legal merit." *Sullivan*, 551 S.W.3d at 857 (internal quotations, citations, and alterations omitted); *see also Pinghua Lei*, 578 S.W.3d at 717.

In their motion to dismiss, Appellants argued that the TCPA applied because Gravity's claims were based on Appellants' exercise of the right of free speech and of the right of association. There is a conflict among the courts of appeals as to whether the "exercise of the right of association," as defined by the TCPA, requires a "citizen" or "public" component. *Compare Dyer v. Medoc Health Servs., LLC*, 573 S.W.3d 418, 426 (Tex. App.—Dallas 2019, pet. denied) (concluding that the "right of association" under the TCPA must involve public or citizen participation), *and Kawcak v. Antero Res. Corp.*, 582 S.W.3d 566, 582 (Tex. App.—Fort Worth

2019, pet. denied) ("A definition of 'common' that focuses on the public or group implements both purposes [of the TCPA] while one that focuses on any interest shared between two people serves neither."), *with Gaskamp v. WSP USA, Inc.*, No. 01-18-00079-CV, 2018 WL 6695810, at \*12 (Tex. App.—Houston [1st Dist.] Dec. 20, 2018, no pet. h.) (concluding that communications between alleged tortfeasors about the formation of a new company, including communications about allegedly misappropriating information and conspiring to breach alleged fiduciary duties, constituted the "[e]xercise of the right of association" under the TCPA) (alteration in original), *Morgan v. Clements Fluids S. Tex., LTD.*, No. 12-18-00055-CV, 2018 WL 5796994, at \*3 (Tex. App—Tyler Nov. 5, 2018, no pet.) (same), *Abatecola*, 2018 WL 3118601, at \*7–8 (same), *and Craig v. Tejas Promotions, LLC*, 550 S.W.3d 287, 295–96 (Tex. App.—Austin 2018, pet. denied) (same). Several courts of appeals have specifically concluded that communications between individuals for the purpose of engaging in a business enterprise constitute the "exercise of the right of association," even if those communications involved confidential information misappropriated from the nonmovant. *See Gaskamp*, 2018 WL 6695810, at \*12; *Morgan*, 2018 WL 5796694, at \*3; *Abatecola*, 2018 WL 3118601, at \*7–8; *Craig*, 550 S.W.3d at 295–96. Therefore, Appellants had a basis in law to assert that the TCPA applied because Gravity's claims were based on Appellants' exercise of the right of association. *See Sullivan*, 551 S.W.3d at 857 (concluding that trial court abused its discretion by finding that motion to dismiss was frivolous because the motion "might be argued to technically fit the act's broad definition of 'legal action'"). In reaching this conclusion, we express no opinion on whether the "exercise of the right of association," as defined by the TCPA, requires a "citizen" or "public" component because the resolution of this question is not necessary for our determination of this issue.

Further, Appellants asserted in the motion to dismiss that Gravity did not have the right to enforce the restrictive covenants in the 2016 and the 2017 Agreements. Although we have held that Gravity established a prima facie case that it has the right to enforce those restrictive covenants, Gravity is not a party to those agreements, and the evidence as to Gravity's relationship with LTRGH and LTRI Holdings is extensive and disputed. On this record, we cannot conclude that the motion to dismiss did not have a basis in fact.

Because Appellants' motion to dismiss has a basis in law and in fact, the trial court abused its discretion when it determined that the motion was frivolous. Further, the trial court did not find that the motion to dismiss was solely intended to delay. Because there is no statutory basis to support the trial court's award of attorney's fees to Gravity, we sustain Appellants' third issue.

*This Court's Ruling*

We reverse that portion of the trial court's order in which it awards attorney's fees to Gravity, and we render judgment that Gravity take nothing on its request for attorney's fees under the TCPA. We affirm the trial court's order in all other respects.

JOHN M. BAILEY
CHIEF JUSTICE

December 19, 2019

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[6]

Willson, J., not participating.

---

[6]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.