**Opinion issued August 6, 2020**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

## NO. 01-18-00867-CV
_____

**MATTRESS FIRM, INC., Appellant**

**V.**

**ALEXANDER DEITCH, Appellee**

---

**On Appeal from the 151st District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-73196**

---

## O P I N I O N

In this case, which arises out of an alleged multiyear fraudulent scheme involving bribes and kickbacks, Mattress Firm, Inc., sued Alexander Deitch, among multiple other defendants who are not parties to this interlocutory appeal, for fraud,

civil conspiracy, and aiding and abetting breach of fiduciary duty. It alleged that Deitch had been unjustly enriched, and it sought the imposition of a constructive trust. Deitch filed counterclaims against Mattress Firm for tortious interference with employment contract, tortious interference with prospective contracts and business relations, and quantum meruit. Mattress Firm moved to dismiss Deitch's tortious interference claims under the Texas Citizens Participation Act (TCPA). The trial court denied Mattress Firm's motion to dismiss.

On appeal, Mattress Firm challenges the trial court's order denying its motion to dismiss Deitch's counterclaims under the TCPA. Mattress Firm first argues that the TCPA applies to Deitch's counterclaims because his counterclaims are based on, relate to, or are in response to Mattress Firm's exercise of its right to free speech and its right to petition. Mattress Firm next argues that Deitch failed to demonstrate a prima facie case on each element of his counterclaims. Finally, Mattress Firm argues that it established a valid defense to Deitch's counterclaims by a preponderance of the evidence because it was legally privileged in making the communications that formed the basis of Deitch's counterclaims.

We affirm.

## Background

### A.   *Mattress Firm's Initial Lawsuit*

Mattress Firm operates retail stores that sell mattresses and other bedding products. Typically, Mattress Firm does not own the real property on which its retail stores are located. Instead, independent real estate developers own the real property and lease the premises to Mattress Firm to operate a retail store. All decisions regarding leases for retail stores are made by Mattress Firm's Real Estate Committee (the Committee), which meets on a monthly basis.

In 2009, Mattress Firm began an aggressive campaign to expand its retail-store presence nationwide. To assist in this endeavor, Mattress Firm employees Bruce Levy and Ryan Vinson recommended that Mattress Firm engage real estate brokerage firm Colliers International—Atlanta, LLC (Colliers Atlanta), and one of its employees, Alexander Deitch, as a "Master Broker." Deitch worked closely with Levy and Vinson, and his responsibilities included "evaluating and recommending to senior management at [Mattress Firm] which stores to open, what leases to sign, the terms of those leases, the construction budgets to approve, what stores to renew, and what stores to close." Mattress Firm engaged Deitch as a broker until March 1, 2016.

In 2017, Mattress Firm sued numerous defendants, including Deitch and Colliers Atlanta—as well as Levy, Vinson, and multiple real estate development

companies and their principals—alleging that the defendants had engaged in a multi-year fraudulent scheme that involved the payment of bribes and kickbacks in an effort to induce Mattress Firm to enter into dozens of lease agreements with unfavorable conditions, such as above-market rental rates and long lease terms. With respect to Deitch specifically, Mattress Firm alleged that he paid bribes and kickbacks to Levy and Vinson in exchange for being retained as a Master Broker, that he charged fraudulent "development fees" and "brokerage fees" to development companies that were payable to him or entities controlled by him, and that he received bribes and kickbacks directly from development companies. Mattress Firm also alleged that Deitch created at least two entities that he used to purchase properties and enter into leases with Mattress Firm, without informing the Committee of his ownership interest in these entities. Mattress Firm alleged that, as a result of this purportedly fraudulent scheme, Mattress Firm paid "significantly above market rents" and "agree[d] to other unfavorable lease terms" for hundreds of leases and that the scheme caused Mattress Firm "to misallocate resources by opening unnecessary stores, thereby harming the sales of existing stores nearby."

Mattress Firm asserted causes of action against Deitch for fraud, civil conspiracy, and aiding and abetting breach of fiduciary duty. It alleged that Deitch, along with Levy and Vinson:

> knowingly made material misrepresentations and omissions to [Mattress Firm], including but not limited to misrepresenting material

4

information about the deals under consideration by failing to disclose the existence of the hidden kickbacks, operating through a network of single purpose LLCs, partnerships, or other entities intended to conceal the unlawful activity, and by falsely representing they were not paying kickbacks, which served to increase the rents [Mattress Firm] would pay, providing inaccurate comparable lease information, and by hiding their ownership interests and self-dealing in multiple [Mattress Firm] store developments.

It also alleged that Deitch and the other defendants "knowingly, willingly, and unlawfully did conspire, combine, confederate, and agree together to defraud" Mattress Firm. Mattress Firm further alleged that Levy and Vinson, as Mattress Firm employees, held "positions of trust and confidence" at Mattress Firm and owed fiduciary duties to the company, and Deitch and the other defendants "illegally capitalized on the positions of authority held by Levy and Vinson for their own personal gain" and aided Levy and Vinson in breaching their duties. Mattress Firm also sought the imposition of a constructive trust and disgorgement of ill-gotten gains, in the form of commissions and above-market rent payments to entities controlled by Deitch, under a theory of unjust enrichment.

## B. Deitch's Counterclaims Against Mattress Firm

Deitch filed counterclaims against Mattress Firm in March 2018. He alleged that although Mattress Firm had engaged him as a broker and labeled him as a "Master Broker," he had no written or verbal "Master Broker" agreement with Mattress Firm, he was never employed by Mattress Firm, and Mattress Firm never paid him. Deitch's counterpetition included details concerning Mattress Firm's

5

expansion strategy—including its acquisitions of competing mattress retailers and its opening of new retail stores—and alleged that the purportedly fraudulent scheme described in Mattress Firm's lawsuit was emblematic of Mattress Firm's corporate culture.

Deitch asserted three counterclaims against Mattress Firm.[1] He asserted a counterclaim for tortious interference with employment contract, alleging that Colliers Atlanta employed him under an at-will "Qualified Real Estate Agent Agreement." He alleged that Mattress Firm terminated his services on March 1, 2016, but as a result of its "continued investigation of Deitch and Colliers [Atlanta] and threats of litigation," Colliers Atlanta terminated his employment on November 2, 2017. Deitch alleged that Mattress Firm willfully and intentionally interfered with Deitch's employment contract with Colliers Atlanta to "scapegoat Deitch for Mattress Firm's reckless growth strategy."

Deitch also asserted a counterclaim for tortious interference with prospective contracts and business relations, alleging that Mattress Firm made "false statements

---

[1] In addition to his two tortious interference counterclaims, Deitch also asserted a counterclaim for quantum meruit, alleging that there was no express contract governing his relationship with Mattress Firm and that Mattress Firm never paid him for his brokerage services. Mattress Firm did not move to dismiss Deitch's quantum meruit claim under the TCPA, and both parties agree that the quantum meruit counterclaim is not at issue in this interlocutory appeal.

about Deitch and [broadcast] those false statements and accusations to as wide a net as possible." Specifically, Deitch alleged:

> On or about March 31, 2016, Mattress Firm directed its executives and/or employees to send an email to multiple individuals, including brokers, real estate developers, and the like, stating, in part, that "Alex Deitch and Colliers International are no longer authorized as master brokers[.] We understand many of you worked with these folks on a regular basis and want to assure you that we don't expect an interruption in the way we conduct business. . . . Due to an ongoing investigation, we are not in a position to provide any more details around this news. . . . If you have any questions, please reach out to me or Karrie Forbes . . . and refrain from discussions with anyone else." True and correct copies of at least two such emails are attached hereto as Exhibit "A".
>
> Mattress Firm carefully sculpted the notice to cause the maximum harm to Deitch.
>
> Mattress Firm's reference to an "ongoing investigation" is intentionally vague and is reasonably calculated to imply a criminal or regulatory investigation.
>
> Mattress Firm's email blast sought to maximize the negative impact on Deitch by distributing it to many recipients who had no need to receive it.
>
> It was reasonably foreseeable that anyone receiving the email blast would reasonably infer that the worst possible conduct had occurred.
>
> It was reasonably foreseeable that the email blast would present Deitch in a false light and that Deitch would suffer business, reputational, and economic harm.

He alleged that, in June 2016, the largest real estate investment trust in the United States fired him and Colliers Atlanta "as a result of the aforementioned email" and that "[t]here was a reasonable probability that Deitch would reach an agreement or

business relationship with countless other clients *but for* Mattress Firm's tortious interference."

## C. The TCPA Proceedings

Mattress Firm moved to dismiss Deitch's two tortious interference counterclaims under the TCPA. Mattress Firm argued that the TCPA applied to both of Deitch's tortious interference counterclaims, as both counterclaims were based upon, related to, or were in response to Mattress Firm's exercise of its right to petition and its right of free speech. It argued that the communications made by Mattress Firm to Colliers Atlanta during the course of its investigation of the alleged fraudulent scheme and while attempting to settle Mattress Firm's underlying lawsuit[2] related to Mattress Firm's right to petition the trial court for relief and related to a matter of public concern—Deitch's brokerage services in the marketplace. It argued that the March 31, 2016 email described in Deitch's counterclaim was made to its vendors to give notice that Deitch—along with Levy, Vinson, and Colliers Atlanta—were no longer authorized to act on Mattress Firm's behalf and to "facilitate a smooth transition to a new team of real estate professionals." It argued that any specific statements concerning Deitch also related

---

[2]    Neither Mattress Firm nor Deitch have identified, with any specificity, what statements Mattress Firm purportedly made to Colliers Atlanta during the investigation and settlement negotiations.

8

to his services in the marketplace and thus constituted an exercise of Mattress Firm's right of free speech.

Mattress Firm also argued that Deitch could not demonstrate, by clear and specific evidence, a prima facie case for each essential element of his tortious interference claims. Specifically, with respect to Deitch's tortious interference with employment contract claim, Mattress Firm argued that Deitch could not establish that Mattress Firm committed any willful or intentional act that interfered with Deitch's employment with Colliers Atlanta. Nor could Deitch present evidence establishing that Mattress Firm's actions caused his termination from Colliers Atlanta or that he sustained any damages as a result of Mattress Firm's conduct.

With respect to Deitch's tortious interference with prospective business relations claim, Mattress Firm argued that Deitch could not establish that a reasonable probability existed that he would have entered into a particular contract, noting that Deitch only alleged in a conclusory fashion that he had been fired from a real estate investment trust and had lost other clients, without identifying specific relationships that he lost as a result of Mattress Firm's March 31, 2016 email. It also argued that Deitch could not establish that the March 31, 2016 email was independently tortious or unlawful, stating that Deitch could not identify anything in the email that was false or defamatory. Mattress Firm also asserted that it sent the March 31, 2016 email to notify its vendors that Deitch no longer worked with

Mattress Firm, and it did not know or intend for its email to cause Deitch to lose any particular future business prospects. Mattress Firm also argued that Deitch could present no evidence that the email caused him any actual losses, and thus he could not establish damages.

Finally, Mattress Firm argued that even if Deitch could establish a prima facie case on each essential element of his tortious interference claims, the trial court still should dismiss the counterclaims because Mattress Firm could establish a valid defense to the claims. Specifically, Mattress Firm argued that its conduct was legally privileged because, in Texas, employers "are privileged in investigating reasonably credible allegations of dishonesty of their employees." It argued:

> Deitch claims that [Mattress Firm] interfered with his employment contract with Colliers [Atlanta] by continuing its investigation and threatening litigation. [Mattress Firm], however, has a legal right to investigate reasonably credible allegations of wrongdoing by its employees. Almost all of Deitch's wrongdoing in this case also involved [Mattress Firm] employees Levy and Vinson. In investigating Levy and Vinson, [Mattress Firm] was simply exercising its rights in good faith. Its conduct was therefore privileged.

Mattress Firm also argued that it had a constitutional right to pursue its claims in court and that its "discussions about and decision to pursue litigation against" Deitch, among others, "was a valid exercise of [Mattress Firm's] constitutional rights, not a tortious interference with Deitch's existing and prospective contracts."

As supporting evidence, Mattress Firm attached two emails sent on March 31, 2016 ("the March 31 emails" or "the Emails"). One email was from Sammy Butera,

10

Mattress Firm's Vice President of Construction & Facilities, and the other email was from Adam Benigni, Mattress Firm's Vice President of Real Estate & Lease Administration. Both of these emails were sent to an undisclosed list of recipients. Butera's email stated:

> I'm writing today to let you know [of] a senior leadership change in our Real Estate & Construction department. Bruce Levy & Ryan Vinson are no longer employees of Mattress Firm. Additionally, Alex Deitch and Colliers International are no longer authorized as master brokers[.] We understand many of you worked with these folks on a regular basis and want to assure you that we don't expect an interruption in the way we conduct business. We have a talented and committed team of real estate & construction professionals who are still here and we expect them to shine during this rebuilding. This department will now report up through Karrie Forbes, our Chief Business Officer. Karrie and I will work closely with our real estate leadership, Adam Benigni, Mike Foster[,] and others to help ensure continuity and a quick rebuilding process for this function.
>
> Due to an ongoing investigation, we are not in a position to provide any more details around this news. However, as soon as we have more details around what the new structure of this function looks like, we will pass those along.
>
> If you have any questions, please reach out to me or Karrie Forbes . . . and refrain from discussions with anyone else.

Benigni's email was substantively identical to Butera's email, but in Benigni's email, the paragraph referencing "an ongoing investigation" included the following sentence at the end: "We may require your assistance with this investigation and we expect your full cooperation."

Mattress Firm also attached as evidence an affidavit from Butera and an affidavit from Maurice Edwards, who worked as Senior Vice President of Enterprise

11

Risk for Mattress Firm during the 2015–2017 time period. Butera averred that the purpose of the Emails was "to advise vendors in the field of a leadership change in the real estate and construction department at Mattress Firm." Butera stated:

> The purpose of the communication was twofold. First, we wanted to facilitate a smooth transition to the new real estate professionals who would be conducting the real estate and construction business of Mattress Firm on a going forward basis. Second, we wanted to make sure that those working on our behalf knew that the identified individuals were no longer authorized to act on our behalf.

> Moreover, at this time, we were receiving a lot of inquiries as to the reason for the departure of our former employees. We did not want to discuss the details of their departure, and therefore I advised the recipients of these emails that due to our ongoing investigation, we would not be able to provide any more details concerning the news.

Edwards averred that he was involved in investigating the facts relating to Mattress Firm's underlying lawsuit. He stated that, in March 2017, Mattress Firm's counsel advised Colliers Atlanta that Mattress Firm had authorized filing a lawsuit against Colliers Atlanta. Edwards participated in a meeting with representatives from Colliers Atlanta "to explore settlement" that occurred in Toronto in June 2017, but "we were unable to reach a settlement and I had no further communications with representatives of Colliers."

In response, Deitch argued, first, that the TCPA did not apply to his tortious interference counterclaims. Deitch argued that the communications that formed the basis of his counterclaims did not address "matters of public concern," but were instead connected to a business dispute that did not implicate the TCPA. He

contended that it was inconsistent for Mattress Firm to argue that the Emails were a communication on a matter of public concern while also stating, in Butera's affidavit, that the purpose of the Emails was simply to notify its vendors of an internal leadership change. Deitch pointed to deposition testimony from Butera, in which he testified that the Emails were "what we would normally do in the course of business" to communicate with vendors and that he did not "have an opinion about how good of a job [Deitch] did." Butera testified that he was not involved with the investigation mentioned in the Emails, and at the time he sent his email, he did not know what kind of investigation was occurring or any specifics about the investigation. Butera was not familiar with Deitch's work for Mattress Firm, and he had no opinion on the quality of Deitch's work.

Deitch also pointed to the deposition testimony of Karrie Forbes, who became Mattress Firm's Chief Operating Officer on April 1, 2016, and who was involved in drafting the language of the Emails. She testified that she had no personal knowledge concerning the quality of Deitch's brokerage work for Mattress Firm and that the Emails were necessary for Mattress Firm to let its "core partners" know of the organizational change so they would know that they "should not call [Deitch] or Colliers." With respect to the "investigation" mentioned in the Emails, Forbes testified that Mattress Firm was investigating "internal changes," specifically the "change with Bruce [Levy] and Ryan [Vinson]." She stated, "We knew something

was wrong [in the real estate department], so we knew that we needed to make some changes," but she also stated that she did not know specific information about the investigation.

Deitch also argued that Mattress Firm's argument that Deitch's counterclaims implicated its right to petition, as defined by the TCPA, was unmeritorious. He argued that Mattress Firm's conduct that formed the basis of his counterclaims occurred "approximately a year and a half before Mattress Firm even initiated its lawsuit." He also argued that Mattress Firm's emails about an "ongoing investigation" and its communications to Colliers Atlanta could not be used to bring Mattress Firm's conduct within the definition of "right to petition" because only communications pertaining to pending judicial proceedings, not potential judicial proceedings, fell within the statutory definition of "right to petition."

Next, Deitch argued that Mattress Firm's motion to dismiss should be denied because he could establish a prima facie case on each element of his tortious interference claims. With respect to his tortious interference with employment contract claim, Deitch pointed to Mattress Firm's own motion to dismiss acknowledging that it continued investigating Deitch for more than a year after it had ended the brokerage relationship. He also pointed to Edwards's affidavit and deposition testimony indicating that Mattress Firm terminated its relationship with Deitch and Colliers Atlanta on March 1, 2016, that Mattress Firm continued its

14

investigation, that Mattress Firm discussed potential litigation and engaged in settlement discussions with Colliers Atlanta, and that Colliers Atlanta terminated Deitch's employment soon after Mattress Firm filed suit. Deitch also relied upon his own affidavit, in which he averred that Mattress Firm wrongfully pressured Colliers Atlanta into terminating his employment. Attached to this affidavit was a letter, dated November 2, 2017, that Deitch received from the president and CEO of Colliers Atlanta concerning the termination of his employment contract. The letter stated:

> You have refused to comply with our request that you appear on November 2, 2017, and participate in [Colliers Atlanta's] internal investigation of Mattress Firm's allegations and related threat of litigation. Based upon the information currently available to us, Colliers . . . is terminating your [employment agreement] and association with Colliers for cause . . . ."

Deitch averred that "it was exactly Mattress Firm's interference and nothing else that lead to [his] termination."

With respect to his tortious interference with prospective business relations claim, Deitch pointed to the allegations in his counterclaim and the Emails themselves, which acknowledged that many of the recipients "worked with these folks [i.e., Levy, Vinson, Deitch] on a regular basis." He also attached emails that Butera received in response to the March 31, 2016 email, including one in which the sender expressed surprise over the news and asked what had happened, and another in which the sender recommended "a really good (honest) young [real estate] broker"

15

who was familiar with Mattress Firm and some of its personnel. He attached another email sent to Edwards in June 2016 in which the sender informed Edwards that Deitch had tried to get in touch with him, but the sender would no longer communicate with Deitch. Deitch also relied upon his affidavit, in which he averred that he lost numerous contracts and business opportunities as a result of the Emails, including employment with a real estate investment trust "due to [Colliers Atlanta's] previous involvement with Mattress Firm." Deitch identified five other clients who terminated their relationships with Deitch or refused to engage in further contact with Deitch after March 31, 2016.

After a hearing, the trial court denied Mattress Firm's motion to dismiss without stating the basis for the denial. Mattress Firm then filed this interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.008; *id.* § 51.014(a)(12) (providing that person may appeal from interlocutory order that denies TCPA motion to dismiss).

## Texas Citizen's Participation Act

In three issues on appeal, Mattress Firm contends that the trial court erred in denying its motion to dismiss Deitch's counterclaims under the TCPA because (1) the TCPA applies to Deitch's counterclaims; (2) Deitch failed to establish a prima facie case on each element of his counterclaims; and (3) Mattress Firm

16

demonstrated a valid defense to the counterclaims by a preponderance of the evidence.

## A.    *Standard of Review*

We review de novo a trial court's ruling on a TCPA motion to dismiss. *Jordan v. Hall*, 510 S.W.3d 194, 197 (Tex. App.—Houston [1st Dist.] 2016, no pet.). In conducting our review, we review the pleadings and the evidence in a light favorable to the nonmovant. *Id.*

Whether the TCPA applies to a particular claim is an issue of statutory interpretation that we review de novo. *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018); *Cheniere Energy, Inc. v. Lotfi*, 449 S.W.3d 210, 213 (Tex. App.—Houston [1st Dist.] 2014, no pet.). When construing a statute, our objective is to determine and give effect to the Legislature's intent. *Youngkin*, 546 S.W.3d at 680 (quoting *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003)). In determining legislative intent, we look to the plain meaning of the statute's words, which is the best expression of legislative intent "unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." *Cheniere Energy*, 449 S.W.3d at 213 (quoting *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011)); *see Youngkin*, 546 S.W.3d at 680 (stating that "enacted language of the statute" is "[t]he 'surest guide to what lawmakers intended'") (quoting *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 463

17

(Tex. 2009)). "We must endeavor to read the statute contextually, giving effect to every word, clause, and sentence." *In re Office of Attorney Gen.*, 422 S.W.3d 623, 629 (Tex. 2013) (orig. proceeding); *Cheniere Energy*, 449 S.W.3d at 213 (stating that we must not interpret statute in manner that renders any part of it meaningless or superfluous) (quoting *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008)). Although we must "adhere to legislative definitions of terms when they are supplied," we must also "construe individual words and provisions in the context of the statute as a whole." *Youngkin*, 546 S.W.3d at 680–81.

## B. TCPA Statutory Framework

The Texas Legislature enacted the TCPA to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury."[3] TEX. CIV. PRAC. & REM. CODE ANN. § 27.002. The TCPA

---

[3] In the 2019 legislative session, the Texas Legislature amended several provisions of the TCPA. These amended provisions became effective on September 1, 2019, and apply to legal actions filed on or after that date. Act of May 17, 2019, 86th Leg., R.S., ch. 378, § 12, 2019 Tex. Sess. Law Serv. 684, 687. For actions filed before September 1, 2019, the action "is governed by the law in effect immediately before that date, and that law is continued in effect for that purpose." *Id.* This action was filed before September 1, 2019. All citations to the TCPA in this opinion are to the prior version of the Act.

"protects citizens from retaliatory lawsuits that seek to intimidate or silence them on matters of public concern." *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015).

A defendant in a legal action that is based on, related to, or in response to the defendant's exercise of the right of free speech, right to petition, or right of association, as those rights are statutorily defined, may file a motion to dismiss the action. TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a); *Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 376 (Tex. 2019). The TCPA defines "[e]xercise of the right of free speech" as a "communication made in connection with a matter of public concern," which includes an issue related to, among other things, a good, product, or service in the marketplace. TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3), (7). The Act defines "[e]xercise of the right to petition" as including, among other things, "a communication in or pertaining to" a judicial proceeding and "any other communication that falls within the protection of the right to petition government under the Constitution of the United States or the constitution of this state." *Id.* § 27.001(4)(A)(i), (E). "Communication" is broadly defined as including "the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id.* § 27.001(1).

Under the TCPA's burden-shifting framework, the movant bears the initial burden to establish, by a preponderance of the evidence, that the legal action is based on, related to, or in response to the party's exercise of the right of free speech, right

to petition, or right of association. *Id.* § 27.005(b); *Hall*, 579 S.W.3d at 376. If the movant makes that showing, the burden shifts to the nonmovant—the party who brought the action—to establish, by clear and specific evidence, a prima facie case for each essential element of the claim in question. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c); *Hall*, 579 S.W.3d at 376. Even if the nonmovant meets his burden to establish a prima facie case, the trial court must dismiss the action if the movant establishes, by a preponderance of the evidence, each essential element of a valid defense to the nonmovant's claim. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d); *Hall*, 579 S.W.3d at 376. When determining the motion to dismiss, the trial court considers the pleadings and any supporting and opposing affidavits. TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a); *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017). The trial court may also allow, upon a showing of good cause, "specified and limited discovery relevant to the motion." TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(b); *Lane v. Phares*, 544 S.W.3d 881, 889 n.1 (Tex. App.—Fort Worth 2018, no pet.) (considering defendant's deposition after trial court allowed discovery relevant to TCPA motion to dismiss).

Although the TCPA defines neither "prima facie case" nor "clear and specific evidence," the Texas Supreme Court has held that "prima facie case" means "evidence that is legally sufficient to establish a claim as factually true if it is not countered." *S & S Emergency Training Sols., Inc. v. Elliott*, 564 S.W.3d 843, 847

(Tex. 2018); *Lipsky*, 460 S.W.3d at 590. That is, a prima facie case is the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Elliott*, 564 S.W.3d at 847 (quoting *Lipsky*, 460 S.W.3d at 590). "Clear" means "unambiguous, sure, or free from doubt," and "specific" means "explicit or relating to a particular named thing." *Id.* (quoting *Lipsky*, 460 S.W.3d at 590). In establishing a prima facie case, the nonmovant may rely on circumstantial evidence "unless 'the connection between the fact and the inference is too weak to be of help in deciding the case.'" *Hall*, 579 S.W.3d at 377 (quoting *Lipsky*, 460 S.W.3d at 589). Conclusory statements, however, are not probative and will not suffice to establish a prima facie case. *Serafine v. Blunt*, 466 S.W.3d 352, 358 (Tex. App.—Austin 2015, no pet.) (quoting *Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 355 (Tex. App.—Houston [1st Dist.] 2013, pet. denied)). The nonmovant need not present direct evidence of damages, "but the evidence must be sufficient to allow a rational inference that some damages naturally flowed from the defendant's conduct." *Elliott*, 564 S.W.3d at 847.

## C.    *Analysis*

### 1.    **Whether the TCPA applies to Deitch's counterclaims**

Mattress Firm first contends that the TCPA applies to Deitch's counterclaims because both of his tortious interference claims are based on, related to, or in response to Mattress Firm's exercise of its right of free speech. Mattress Firm also

contends that Deitch's tortious interference with employment contract claim is based on, related to, or in response to Mattress Firm's exercise of its right to petition.

Deitch asserted two counterclaims against Mattress Firm. With respect to his tortious interference with employment contract claim, Deitch alleged that, "[d]ue to Mattress Firm's continued investigation of Deitch and Colliers [Atlanta] and threats of litigation, Deitch was ultimately terminated by Colliers on November 2, 2017." With respect to his tortious interference with prospective contracts and business relations, Deitch alleged that Mattress Firm made "false statements about Deitch and [broadcast] those false statements and accusations to as wide a net as possible." Specifically, Deitch alleged that on March 31, 2016, Mattress Firm personnel sent two emails to an undisclosed list of recipients, including vendors, brokers, and real estate developers, that stated, among other things, that Deitch and Colliers Atlanta were "no longer authorized as master brokers" and that there would be a leadership change and a transition period in Mattress Firm's real estate department. The Emails further stated, "Due to an ongoing investigation, we are not in a position to provide any more details around the news." Deitch alleged that Mattress Firm's statement about an "ongoing investigation" was deliberately vague and implied "a criminal or regulatory investigation," thus making it reasonably foreseeable that recipients of the Emails would "infer that the worst possible conduct had occurred" and that the Emails would "present Deitch in a false light."

22

### a. *Exercise of right of free speech*

We first address whether Mattress Firm established, by a preponderance of the evidence, that Deitch's claims were based on, related to, or in response to Mattress Firm's exercise of its right of free speech. As stated above, the TCPA defines "[e]xercise of the right of free speech" as "a communication made in connection with a matter of public concern" and defines "[m]atter of public concern" as including "an issue related to":

(A)    health or safety;

(B)    environmental, economic, or community well-being;

(C)    the government;

(D)    a public official or public figure; or

(E)    a good, product, or service in the marketplace.

TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3), (7). In arguing that Deitch's counterclaims involve a communication made in connection with a matter of public concern, Mattress Firm focuses on the fifth subpart of the definition of "matter of public concern"—"a good, product, or service in the marketplace."

Private communications made in connection with a matter of public concern fall within the statutory definition of "exercise of the right of free speech." *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015) (per curiam); *Dyer v. Medoc Health Servs., LLC*, 573 S.W.3d 418, 427–28 (Tex. App.—Dallas 2019, pet. denied). The TCPA does not require the communication to specifically mention concerns

about a service in the marketplace, nor does it require more than a tangential relationship to such an issue. *See ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 900 (Tex. 2017) (per curiam). "[R]ather, TCPA applicability requires only that the defendant's statements are 'in connection with'" issues related to "identified matters of public concern chosen by the Legislature." *Id.*; *Fawcett v. Rogers*, 492 S.W.3d 18, 25 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (stating that "private nature of the communications" that were basis of plaintiff's defamation suit "does not affect the applicability of" TCPA to plaintiff's claims). However, this is not the end of the inquiry into the applicability of the TCPA to private communications.

In *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, the Texas Supreme Court recently construed the "good, product, or service in the marketplace" category of "matters of public concern," focusing on the "in the marketplace" modifier and its impact on the TCPA's applicability to disputes and transactions that are essentially private in nature. 591 S.W.3d 127 (Tex. 2019). In that case, Lona Hills Ranch entered into an oil and gas lease with Creative Oil & Gas, and a related entity, Creative Oil & Gas Operating, LLC, operated a producing well on the lease. *See id.* at 130. Lona Hills Ranch sued both Creative entities for trespass and trespass to try title, arguing that the lease had been terminated due to cessation in production. *Id.* The Creative entities counterclaimed, asserting that (1) Lona Hills Ranch had falsely told third-party purchasers of production from the lease that the lease had expired

24

and payments on the purchases should stop, and (2) Lona Hills Ranch had breached the lease by filing suit and bringing an administrative action relating to the lease before the Texas Railroad Commission. *Id.* Lona Hills Ranch moved to dismiss the counterclaims under the TCPA, but this motion was denied by operation of law. *Id.* The Austin Court of Appeals reversed the denial, holding, in relevant part, that the TCPA applied because Lona Hills Ranch's communications to third-party purchasers were "an exercise of the right of free speech." *Id.* at 130–31. The Texas Supreme Court granted the Creative entities' petition for review.

Before the Texas Supreme Court, Lona Hills Ranch argued that the TCPA applied to its communications to third parties regarding the alleged termination of the lease because the communications involved the lease and oil and gas products produced pursuant to the lease that were "a good, product, or service in the marketplace." *Id.* at 134. The Texas Supreme Court noted that "nearly all contracts involve 'a good, product, or service,'" but the TCPA "refers to a 'good, product, or service *in the marketplace*,'" and thus the statute "does not encompass every 'good, product, or service,' but only those 'in the marketplace.'" *Id.* (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7)). The court then recited well-established canons of statutory construction, namely, that phrases in a statute, if possible, must not be treated as surplusage and that, if reasonable and possible, every word in a statute is presumed to have a purpose and should be given effect. *Id.* (citing *Coleman*,

25

512 S.W.3d at 899, *Cont'l Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 402 (Tex. 2000), and *Tex. Workers' Comp. Ins. Fund v. Del Indus., Inc.*, 35 S.W.3d 591, 593 (Tex. 2000)). The court also noted that "marketplace" is defined, albeit not in the TCPA itself, as "[t]he business environment in which goods and services are sold *in competition with other suppliers*." *Id.* (quoting BLACK'S LAW DICTIONARY (11th ed. 2019)).

> The Texas Supreme Court stated:
>
> The "in the marketplace" modifier suggests that the communication about goods or services must have some relevance to a wider audience of potential buyers or sellers in the marketplace, as opposed to communications of relevance only to the parties to a particular transaction.
>
> Given the "in the marketplace" modifier, the TCPA's reference to "a good, product, or service" does not swallow up every contract dispute arising from a communication about the contract. By referring to communications made in connection with goods, products, or services "in the marketplace," the definition confirms that the right of free speech involves communications connected to "a matter of *public* concern."

*Id.* The phrase "good, product, or service in the marketplace" does not "paradoxically enlarge the concept of 'matters of public concern' to include matters of purely private concern." *Id.* at 135. The Texas Supreme Court also pointed out that the phrase "good, product, or service in the marketplace" does not appear in isolation in the TCPA, but it instead appears "as part of the statute's explanation of what is meant by 'matter of public concern.'" *Id.* The court stated that, in construing

26

"good, product, or service in the marketplace," courts must not ignore the ordinary meaning of "matter of public concern," which "commonly refers to matters 'of political, social, or other concern to the community,' as opposed to purely private matters." *Id.* (quoting *Brady v. Klentzman*, 515 S.W.3d 878, 884 (Tex. 2017)).

Applying this construction of "good, product, or service in the marketplace" to the case before it, the Texas Supreme Court concluded that the Creative entities' counterclaims did not fall within the protections of the TCPA. *Id.* at 135–36. The counterclaims in that case were "based on private business communications to third-party purchasers of a single well's production," which allegedly caused the third-party purchasers to refuse to pay the Creative entities "their share of the proceeds from this production." *Id.* at 136. The court stated:

> The record is devoid of allegations or evidence that the dispute had any relevance to the broader marketplace or otherwise could reasonably be characterized as involving public concerns. On the contrary, the alleged communications were made to two private parties concerning modest production at a single well. These communications, with a limited business audience concerning a private contract dispute, do not relate to a matter of public concern under the TCPA.

*Id.* The court also distinguished that case from *Coleman* and *Lippincott*, both of which involved private communications, but private communications that involved "environmental, health, or safety concerns that had public relevance beyond the pecuniary interests of the private parties involved." *Id.* (citing *Coleman*, 512 S.W.3d at 898, 901, and *Lippincott*, 462 S.W.3d at 509–10). The court concluded by stating,

27

"A private contract dispute affecting only the fortunes of the private parties involved is simply not a 'matter of public concern' under any tenable understanding of those words." *Id.* at 137.

*Creative Oil & Gas* controls here. Mattress Firm's communications with Colliers Atlanta that form the basis of Deitch's tortious interference with employment contract claim are never identified with any specificity beyond Deitch's allegation in his counterpetition that "[d]ue to Mattress Firm's continued investigation of Deitch and Colliers [Atlanta] and threats of litigation, Deitch was ultimately terminated by Colliers [Atlanta] on November 2, 2017" and Edwards's affidavit, in which he averred that, in March 2017, Mattress Firm's counsel advised Colliers Atlanta that Mattress Firm had authorized the filing of a lawsuit against it and that Mattress Firm had engaged in settlement negotiations with Colliers Atlanta that were unsuccessful. Presumably, during the investigation and during the settlement negotiations, Mattress Firm and Colliers Atlanta discussed Deitch's allegedly fraudulent conduct and any conduct of Colliers Atlanta in furtherance of the allegedly fraudulent scheme.[4] However, these communications would have

---

[4]     In *Staff Care, Inc. v. Eskridge Enters., LLC*, No. 05-18-00732-CV, 2019 WL 2121116, at *4 (Tex. App.—Dallas May 15, 2019, no pet.) (mem. op.), the defendant, in its counterclaims, set out several communications by the plaintiff that allegedly formed the basis of its causes of action, including the following allegation: "66. Plaintiff's communication with existing physicians, prospective doctors, and Eskridge is a form of commercial advertising." The Dallas Court of Appeals noted that "Communication number 66 (Staff Care engaging in commercial advertising)

occurred within the context of attempting to resolve a private business dispute with no connection to the broader marketplace for real estate brokerage services. *See id.*

Similarly, Mattress Firm personnel sent the March 31 emails to an undisclosed list of recipients. Sammy Butera, Mattress Firm's Vice President of Construction and Facilities, averred that he sent his email to "various vendors who provided real estate and construction management services to Mattress Firm." Among other things, Butera's email and Benigni's substantively identical email notified the recipients that Levy and Vinson no longer worked for Mattress Firm and that Deitch and Colliers Atlanta were no longer authorized to act as "master brokers." The Emails also stated, "Due to an ongoing investigation, we are not in a position to provide any more details around this news." Benigni's email further stated, "We may require your assistance with this investigation and we expect your full cooperation."

---

fails to identify the contents of the communication." *Id.* at *5 n.3. The court stated, "Without such information, a court cannot determine whether the alleged communication falls under the statutory definitions of the TCPA." *Id.*; *see also Gaskamp v. WSP USA, Inc.*, 596 S.W.3d 457, 477 (Tex. App.—Houston [1st Dist.] 2020, pet. filed) (en banc) ("We note that the First Amended Petition mentions that Sinz and Appellants engaged in 'off-book projects.' However, the pleading does not provide any additional information from which it can be determined whether the conduct involved communications protected by Appellants' right of free speech."); *Rossa v. Mahaffey*, 594 S.W.3d 618, 626 (Tex. App.—Eastland 2019, no pet.) ("Rossa's petition in this case does not contain any specific allegations about when, where, and to whom the allegedly defamatory statements were made. Therefore, Rossa's petition, viewed 'holistically,' does not demonstrate that the defamation claim falls within the TCPA because the claim is based on, related to, or in response to Mahaffey's exercise of the right to petition.").

Butera averred that "the purpose of the [email] communication was to advise vendors in the field of a leadership change in the real estate and construction department at Mattress Firm." He further averred:

> The purpose of the communication was twofold. First, we wanted to facilitate a smooth transition to the new real estate professionals who would be conducting the real estate and construction business of Mattress Firm on a going forward basis. Second, we wanted to make sure that those working on our behalf knew that the identified individuals were no longer authorized to act on our behalf.

> Moreover, at this time, we were receiving a lot of inquires as to the reason for the departure of our former employees. We did not want to discuss the details of their departure, and therefore I advised the recipients of these emails that due to our ongoing investigation, we would not be able to provide any more details concerning the news.

In his deposition, Butera testified that he did not draft the language in the Emails, but he was instructed to send his email "out to folks that we worked with closely." He stated that he was not involved with the investigation mentioned in the Emails, and at the time he sent his email, he did not know what kind of investigation was occurring or any specifics about the investigation. Butera testified in his deposition, as he did in his affidavit, that the purpose of the Email was to let vendors know about the change in Mattress Firm's real estate department and that Levy, Vinson, and Deitch were no longer authorized to work on Mattress Firm's behalf. Butera agreed that he was not familiar with Deitch's work for Mattress Firm and that he did not "have an opinion about how good of a job he did."

Karrie Forbes testified in her deposition that, after discussing the matter with Mattress Firm's legal department, she instructed Butera to send the March 31 email, but she did not direct him to send the email to specific individuals. She stated that the Emails were sent because Mattress Firm "needed to let people know that there was a change in the organization." When asked what the "investigation" mentioned in the Emails referred to, Forbes testified, "[t]he internal changes were what we were investigating . . . the change with Bruce [Levy] and Ryan [Vinson]." She stated, "We knew something was wrong [in the real estate department], so we knew that we needed to make some changes," but she also stated that she did not know specific information about the investigation. Forbes testified that the Emails were necessary because Mattress Firm's partners needed to know that they "should not call [Deitch] or Colliers." She further testified that she had never met Deitch and she had never interacted with him.

Mattress Firm sent two relevant emails to an undisclosed list of vendors on March 31, 2016—one by Butera, and a substantively identical one by Benigni—and both Emails addressed a leadership change that had occurred at Mattress Firm. The Emails informed the recipients that Levy and Vinson were no longer employees of Mattress Firm and that Deitch and Colliers Atlanta were no longer authorized as "master brokers." Although the Emails mentioned that "an ongoing investigation" was occurring, the Emails did not state what kind of investigation was occurring or

31

the subject matter of the investigation. Two Mattress Firm employees testified, in an affidavit and by deposition, that the purpose of the Emails was to notify Mattress Firm's close partners of the personnel change, to provide assurances during a transition period, and to head off inquiries about the departures. The Emails did not mention any specific conduct by Deitch, such as specific allegedly wrongful acts, nor did the Emails express an opinion on the quality of Deitch's work as a broker for Mattress Firm.

We agree with Deitch that the content of the Emails is not related to his brokerage services in the marketplace. The Emails do not explicitly discuss any of Deitch's conduct or his brokerage services, nor do the Emails contain an opinion concerning the quality of his services. This is not a situation in which Mattress Firm directed its communications to an audience of those seeking commercial brokerage services. *See, e.g.*, *John Moore Servs.*, 441 S.W.3d at 353–54 (stating, in case involving Better Business Bureau's publicly-accessible rating of local business, that "[t]he exercise of the right of free speech as contemplated by the TCPA includes a person's right to communicate reviews or evaluations of services in the marketplace"). Instead, Mattress Firm made the communications for the purposes of making its partners who had closely worked with Deitch, Levy, and Vinson in the past aware that they were no longer affiliated with or employed by Mattress Firm and that the partners should not contact Deitch, Levy, or Vinson for future Mattress

Firm business. These communications were therefore made and intended for a narrow audience of people who had previously worked with Deitch, Levy, and Vinson on a regular basis for Mattress Firm-related projects. *See Creative Oil & Gas*, 591 S.W.3d at 134 ("The 'in the marketplace' modifier suggests that the communication about goods or services must have some relevance to a wider audience of potential buyers or sellers in the marketplace, as opposed to communications of relevance only to the parties to a particular transaction.").

As Butera's and Forbes's testimony makes clear, Mattress Firm's Emails were sent for a limited purpose to a limited group of recipients to address an internal change in the structure of Mattress Firm's real estate department. We conclude that these Emails do not relate to "a good, product, or service in the marketplace" and therefore do not relate to a matter of public concern. *See id.* at 136 ("These communications, with a limited business audience concerning a private contract dispute, do not relate to a matter of public concern under the TCPA."); *see also Forget About It, Inc. v. BioTE Med., LLC*, 585 S.W.3d 59, 68 (Tex. App.—Dallas 2019, pet. denied) ("[A] private communication made in connection with a business dispute is not a matter of public concern under the TCPA."); *Erdner v. Highland Park Emergency Ctr., LLC*, 580 S.W.3d 269, 277 (Tex. App.—Dallas 2019, pet. denied) ("Construing the statute to denote that all private business discussions are a 'matter of public concern' if the business offers a good, service, or product in the

33

marketplace or is related to health or safety is a potentially absurd result that was not contemplated by the Legislature."). We further conclude that Mattress Firm has not demonstrated by a preponderance of the evidence that Deitch's tortious interference counterclaims are based on, related to, or in response to Mattress Firm's exercise of its right of free speech.

As the exercise of the right of free speech was the only basis for applicability of the TCPA asserted by Mattress Firm with respect to Deitch's counterclaim for tortious interference with prospective business relations, we hold that the trial court did not err when it denied Mattress Firm's motion to dismiss this counterclaim. We now turn to whether Mattress Firm demonstrated by a preponderance of the evidence that Deitch's tortious interference with employment contract claim was based on, related to, or in response to Mattress Firm's exercise of the right to petition.

### b. *Exercise of the right to petition*

The TCPA broadly defines "exercise of the right to petition" and sets out several ways in which a communication can implicate this right. *Dyer*, 573 S.W.3d at 429; *Tervita, LLC v. Sutterfield*, 482 S.W.3d 280, 283 (Tex. App.—Dallas 2015, pet. denied). Under the TCPA, "exercise of the right to petition" includes a communication in or pertaining to "a judicial proceeding" as well as "any other communication that falls within the protection of the right to petition government under the Constitution of the United States or the constitution of this state." TEX.

34

CIV. PRAC. & REM. CODE ANN. § 27.001(4)(A)(i), (E); *see* U.S. CONST. amend. I ("Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances."); TEX. CONST. art. I, § 27 ("The citizens shall have the right . . . [to] apply to those invested with the powers of government for redress of grievances or other purposes, by petition, address or remonstrance."). Mattress Firm, in its motion to dismiss, asserted that the communications with Colliers Atlanta satisfied both of these statutory definitions of "exercise of the right to petition."

With respect to the first definition, a communication "in or pertaining to a judicial proceeding," courts have held that "the ordinary meaning of 'a judicial proceeding' is an actual, pending judicial proceeding." *Dyer*, 573 S.W.3d at 429; *QTAT BPO Sols., Inc. v. Lee & Murphy Law Firm, G.P.*, 524 S.W.3d 770, 778 (Tex. App.—Houston [14th Dist.] 2017, pet. denied); *Levatino v. Apple Tree Café Touring, Inc.*, 486 S.W.3d 724, 728–29 (Tex. App.—Dallas 2016, pet. denied) (also noting that Black's Law Dictionary defines "judicial proceeding" as "any proceeding initiated to procure an order or decree, whether in law or in equity") (quoting *Judicial proceeding*, BLACK'S LAW DICTIONARY (10th ed. 2014)). In *Levatino*, the Dallas Court of Appeals refused to construe the phrase "pertaining to" as "expand[ing] the ordinary meaning of 'a judicial proceeding' to include anticipated or potential future judicial proceedings." 486 S.W.3d at 729. Thus, to establish applicability of the

35

TCPA using this definition of "exercise of the right to petition," courts have required the movant to present evidence that a pending judicial proceeding existed at the time of the communication and that the communication was made in connection with such a proceeding. *See Dyer*, 573 S.W.3d at 429.

Mattress Firm presented no evidence that a judicial proceeding was pending at the time it made the alleged communications to Colliers Atlanta. On appeal, Mattress Firm provides no argument that the communications to Colliers Atlanta were in or pertaining to a pending judicial proceeding. Instead, it focuses on the second definition of "exercise of the right to petition" that it raised in its motion to dismiss—a communication "that falls within the protection of the right to petition government under the Constitution of the United States or the constitution of this state." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(4)(E).

In *Long Canyon Phase II & III Homeowners Ass'n, Inc. v. Cashion*, the Austin Court of Appeals addressed whether a pre-suit demand letter sent by a homeowner's association to two homeowners implicated the association's right to petition under subsections 27.001(4)(A)(i) and (E). *See* 517 S.W.3d 212, 220–21 (Tex. App.—Austin 2017, no pet.). The Austin Court, following *Levatino*, first concluded that because the letter was a *pre-suit* demand letter, it was necessarily sent before a judicial proceeding was initiated, the letter did not pertain to a judicial proceeding and did not fall within the definition of "exercise of the right to petition" contained

in subsection 27.001(4)(A)(i). *Id.* at 220. The court then addressed whether the demand letter fell within subsection 27.001(4)(E). The court stated:

> Subsection (E) reflects legislative intent that the definition be consistent with and incorporate the nature and scope of the "right to petition" that had been established in constitutional jurisprudence. The established understanding under First Amendment jurisprudence, both now and at the time of the TCPA's enactment, was that presuit demand letters generally fall within the "right to petition," although there is a federal circuit court case holding otherwise in the view that the petition right embraces only communications made to or toward government and not those between private parties. While the majority rule indeed appears to be founded on a policy-laden notion of courts providing "breathing space" for the underlying right as opposed to specific support in constitutional text, we must presume that the Legislature intended this view of the protection's scope to control nonetheless.

*Id.* at 220–21; *see Moricz v. Long*, No. 06-17-00011-CV, 2017 WL 3081512, at *4 (Tex. App.—Texarkana July 20, 2017, no pet.) (following Austin Court's analysis in *Long Canyon*).

The homeowners in *Long Canyon* argued that the allegations in the association's demand letter were meritless and made in bad faith, and thus the letter was an act of "sham petitioning," which is a "category of speech that falls outside First Amendment protection." *Long Canyon*, 517 S.W.3d at 221. The Austin Court concluded that the homeowners had not demonstrated that the allegations in the demand letter were "objectively baseless," such that "no reasonable litigant could realistically expect success on the merits." *Id.* As a result, the court held that the trial court "could only conclude" that the demand letter "sufficed as the 'exercise of the

right to petition.'" *Id.*; *Moricz*, 2017 WL 3081512, at *4 (holding that pre-suit demand letters were "an exercise of [the defendant's] right to petition").

This case—unlike *Long Canyon* and *Moricz*, in which the demand letters at issue were made part of the record—does not involve a pre-suit demand letter. Indeed, the record in this case contains no evidence of what Mattress Firm's alleged communications to Colliers Atlanta actually were. In his counterclaim for tortious interference with employment contract, Deitch alleged that "[d]ue to Mattress Firm's continued investigation of Deitch and Colliers and threats of litigation, Deitch was ultimately terminated by Colliers on November 2, 2017." Maurice Edwards averred that "[i]n March of 2017, Mattress Firm's counsel advised Colliers International Group Inc. and Colliers—Atlanta ("Colliers") that we had authorized the filing of a lawsuit against Colliers based on the facts alleged in the above matter." Edwards further averred that, in June 2017, he participated in a meeting with representatives of Mattress Firm and Colliers to "explore settlement," but the parties were unable to reach a settlement.

The record does not contain specific statements made by Mattress Firm during the course of its investigation or its settlement discussions with Colliers Atlanta. Edwards averred that Mattress Firm "advised" Colliers Atlanta that litigation had been authorized. During his deposition, Edwards testified that he "had no involvement" in Mattress Firm's "advising" of Colliers Atlanta and that he did not

know how Mattress Firm advised Colliers Atlanta. There is no indication in the record of who made the communications on behalf of Mattress Firm and what their role was in the investigatory and settlement-negotiation process. Without evidence of specific communications made by Mattress Firm to Colliers Atlanta concerning litigation—such as a demand letter—there is only Deitch's conclusory allegation that Mattress Firm made unspecified "threats of litigation" to Colliers Atlanta. Mattress Firm, as the TCPA movant, bears the burden to establish by a preponderance of the evidence that Deitch's counterclaim is based on, related to, or in response to Mattress Firm's exercise of its right to petition. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b).

Moreover, we note that section 27.001(4)(E) provides that "exercise of the right to petition" includes "any other communication that falls within the protection of *the right to petition government . . . .*" *Id.* § 27.001(4)(E) (emphasis added). Statements made between parties during an internal investigation of alleged misconduct and during potential settlement negotiations in advance of any litigation being filed are "purely private matters" and do not implicate a party's constitutional right to petition the government for redress of grievances. *See Creative Oil & Gas*, 591 S.W.3d at 135 (stating that, when construing TCPA's list of "matter[s] of public concern" relevant to right of free speech, courts "should not ignore the meaning of the words being defined" and should take into account that "phrase 'matter of public

concern' commonly refers to matters 'of political, social, or other concern to the community,' as opposed to purely private matters"). We cannot agree that the unspecified communications by Mattress Firm, presumably made during Mattress Firm's internal investigation of the alleged misconduct and during its private settlement discussions with Colliers Atlanta, fall within Mattress Firm's protected constitutional right to petition the government. *See Youngkin*, 546 S.W.3d at 680–81 (stating that courts should "construe individual words and provisions in the context of the statute as a whole"); *see also Lipsky*, 460 S.W.3d at 586 (stating that TCPA "protects citizens from retaliatory lawsuits that seek to intimate or silence them on matters of public concern).

We conclude that, in the absence of evidence of the specific content of the communications that, according to Mattress Firm, form the basis of Deitch's tortious interference with employment contract claim, Mattress Firm has not met its burden to show by a preponderance of the evidence that its communications fell within the definition of "exercise of the right to petition." *See Staff Care, Inc. v. Eskridge Enters., LLC*, No. 05-18-00732-CV, 2019 WL 2121116, at *5 n.3 (Tex. App.—Dallas May 15, 2019, no pet.) (mem. op.) (noting that allegation in counterclaim concerning plaintiff's communications "fails to identify the contents of the communication" and stating that "[w]ithout such information, a court cannot determine whether the alleged communication falls under the statutory definitions

of the TCPA"); *see also Gaskamp v. WSP USA, Inc.*, 596 S.W.3d 457, 477 (Tex. App.—Houston [1st Dist.] 2020, pet. filed) (en banc) ("We note that the First Amended Petition mentions that Sinz and Appellants engaged in 'off-book projects.' However, the pleading does not provide any additional information from which it can be determined whether the conduct involved communications protected by Appellants' right of free speech."); *Rossa v. Mahaffey*, 594 S.W.3d 618, 626 (Tex. App.—Eastland 2019, no pet.) ("Rossa's petition in this case does not contain any specific allegations about when, where, and to whom the allegedly defamatory statements were made. Therefore, Rossa's petition, viewed 'holistically,' does not demonstrate that the defamation claim falls within the TCPA because the claim is based on, related to, or in response to Mahaffey's exercise of the right to petition."). We therefore hold that Mattress Firm has not met its burden to establish that the TCPA applies to Deitch's tortious interference claim.

Because we hold that Mattress Firm has not demonstrated the applicability of the TCPA to either of Deitch's challenged counterclaims, we need not address whether Deitch presented clear and specific evidence of a prima facie case on each element of his counterclaims, nor must we address whether Mattress Firm established a defense to Deitch's counterclaims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c)–(d). We overrule Mattress Firm's issues on appeal.

## Conclusion

We affirm the order of the trial court denying Mattress Firm's motion to dismiss Deitch's tortious interference counterclaims under the TCPA.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Goodman, and Countiss.