

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00553-CV

———————————————

ZILLOW, INC. AND ZILLOW GROUP, INC., Appellants

V.

BMB DEVELOPMENT, LLC, MICHAEL BENSON, AND BRADINA BENSON,
Appellees

On Appeal from the 271st District Court
Wise County, Texas
Trial Court No. CV24-05-398

Before Kerr, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

In this interlocutory appeal, Appellants Zillow, Inc. and Zillow Group, Inc.[1] challenge the trial court's order denying their motion to dismiss under the Texas Citizens Participation Act (TCPA). Because we agree with Appellees BMB Development, LLC, Michael Benson, and Bradina Benson that the TCPA's commercial-speech exemption applies, we will affirm. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.010(a)(2).

## I. Factual and Procedural Background

Michael and Bradina Benson, through their business BMB Development, LLC, own, renovate, and sell commercial and residential property in Texas. In June of 2019, they purchased adjacent 9-acre and 16-acre tracts in Wise County and spent over $300,000 on renovations and improvements.[2] The Property includes many unique improvements, including a 9,600-square-foot Spanish-style mansion dubbed La Casa de Fe (House of Faith); a swimming pool with a 32-foot infinity edge; a pool house; a guest villa; a tennis and basketball court; a commercial kitchen with six ovens; an outdoor kitchen with the capacity to cook 40 steaks simultaneously; a solar farm; a helicopter landing pad; a hanger–barn building "ideal for storing helicopters, boats, RVs, or horses"; a chicken coop; and a driving range.

---

[1]For ease and clarity, we refer to both Appellants as "Zillow."

[2]The residential address for the tracts is 2721 Old Decatur Road, Decatur, Texas 76234. We refer to these tracts collectively as the Property.

In April of 2023, the Bensons decided to sell the Property. They entered into a listing agreement with Coldwell Banker Realty, and by May 20, 2023, the Property was listed for sale on the multiple listing service (MLS) for $14.25 million. Coldwell launched a rollout campaign to attract buyers, and within days, various media outlets, including the Wall Street Journal, Robb Report, and Dallas Morning News, had written about the Property. The Bensons claimed—despite their extensive real-estate background—that they did not know that when the Property was listed on MLS, it would also be listed on Zillow's website, www.zillow.com.

Zillow holds itself out as a real-estate-marketplace company that provides information and services related to selling, buying, renting, and financing real estate through its platform, which is accessible through its website and mobile application. According to Zillow, the Property was listed on its website because it pulled information about the Property from MLS—through separate agreements it maintained with MLS—and placed that information on its website.

The Bensons allege that three weeks after listing the Property, Bradina searched for the Property on DuckDuckGo (a search engine similar to Google) and determined that Zillow was publishing false statements about the Property. According to the Bensons, as of June 9, 2023, Zillow's website stated the following about the Property:

2721 Old Decatur Rd,
Decatur, TX 76234 | MLS
#20322012 | Zillow
Auctions Foreclosed These properties are owned by a bank or a lender
who took ownership through foreclosure proceedings. They may soon

3

be listed for sale. Pre-foreclosures The lender initiated foreclosure proceedings on these properties because the owner (s) were in default on their loan obligations.

Because the Bensons owned the Property and were not in default on any loan obligations, Bradina emailed Zillow demanding that the information be removed. Zillow instructed Bradina to contact her listing agent, asserting that it had not published the alleged statements; rather, Zillow insisted that DuckDuckGo had published the alleged statements.

The Bensons also came to believe that Zillow had published additional false statements about the Property: (1) that the Property was in Alvord, Texas and (2) that the Property consisted of "apartments or townhomes" for rent. The Bensons again emailed Zillow about the additional issues with the listing, but Zillow did not resolve any of these issues to their satisfaction.

The Property did not sell, and the Bensons blamed Zillow for "torpedo[ing]" their rollout campaign and "squander[ing] the crucial first 60–90 days the Property was on the market." The Bensons decided to switch listing agents in late summer of 2023, but the broker and listing agent refused, requiring the Bensons to sign a document releasing the listing and to reimburse certain expenses. The Bensons alleged that they were "[t]rapped without the ability to effectively and competently market the Propert[y]" and "signed the document that the [broker] and [listing agent]'s attorneys provided under duress."

4

The Bensons eventually entered into a new listing agreement, and around November 27, 2023, the Property again appeared on Zillow's website but, this time, with no issues. According to the Bensons, they were "forced to re-list the [P]ropert[y] . . . at a substantially reduced price," and the Property remained unsold as of May 20, 2024.

The Bensons sued Zillow for tortiously interfering with their listing agreement, tortiously interfering with prospective business relations with potential buyers, and defaming them.[3] In response, Zillow answered and filed a TCPA motion to dismiss. Among other things, Zillow argued that the Bensons—who had allegedly dropped the asking price by over $5 million—had overvalued the Property, misjudged a market "plagued by exorbitant interest rates," and baselessly blamed Zillow for their inability to sell the Property.

In response to the TCPA motion, the Bensons argued that Zillow's speech was exempt commercial speech and was not a matter of public concern. The Bensons also argued that they had established a prima facie case for each essential element of their claims. They further argued that Zillow could not show as a matter of law that it was immune from liability because it had generated the content at issue.

---

[3]The Bensons also sued (1) their broker and listing agent for negligence, who are not parties to this appeal, and (2) search-engine companies Google, Microsoft, and DuckDuckGo, which the Bensons later nonsuited.

After hearing the motion, the trial court signed an order denying Zillow's motion. The order did not state the grounds upon which it ruled.

## II. The TCPA

"The TCPA is an early-stage litigation device designed to dispose of meritless legal actions filed to impede the exercise of some First Amendment rights." *Montoya Frazier v. Maxwell*, No. 02-23-00103-CV, 2025 WL 494699, at *7 (Tex. App.—Fort Worth Feb. 13, 2025, no pet. h.) (en banc) (first citing *Montelongo v. Abrea*, 622 S.W.3d 290, 299–300 (Tex. 2021); and then citing Tex. Civ. Prac. & Rem. Code Ann. §§ 27.002, .005). Once a TCPA motion to dismiss is filed, courts must undertake a three-part burden-shifting analysis:

> The three steps are as follows: (1) the party invoking the TCPA must demonstrate that a "legal action" has been brought against it that is "based on or is in response to" an exercise of the rights of free speech, petition, or association protected by the Act; (2) if the moving party successfully invokes the Act, "[t]he court may not dismiss a legal action under this section if the party bringing the legal action establishes by clear and specific evidence a prima facie case for each essential element of the claim in question[";] and (3) if the nonmoving party carries its burden, the case may still be dismissed "if the moving party establishes an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." [Tex. Civ. Prac. & Rem. Code Ann.] § 27.005(b)–(d).

*Avid Square Constr., LLC v. Valcon Consulting, LLC*, No. 02-22-00297-CV, 2023 WL 3113950, at *2 (Tex. App.—Fort Worth Apr. 27, 2023, no pet.) (mem. op.) (quoting *Miller v. Watkins*, No. 02-20-00165-CV, 2021 WL 924843, at *7 (Tex. App.—Fort Worth Mar. 11, 2021, no pet.) (mem. op.)).

But the TCPA also contains exemptions to its applicability, which a party must establish by an evidentiary preponderance. Tex. Civ. Prac. & Rem. Code Ann. § 27.010(a) (listing actions to which the TCPA does not apply); *see NexPoint Advisors, L.P. v. United Dev. Funding IV*, 674 S.W.3d 437, 445 (Tex. App.—Fort Worth 2023, pets. denied). Following our sister court in Dallas, we have observed that "when both step one and an exemption are at issue, judicial economy warrants analyzing the contested exemption first: if the action is of a type listed in [S]ection 27.010, the step one analysis is pointless." *Stickland v. Schlegel*, No. 02-22-00281-CV, 2023 WL 8112889, at *15 (Tex. App.—Fort Worth Nov. 22, 2023, pet. denied) (mem. op.) (citing *Temple v. Cortez Law Firm, PLLC*, 657 S.W.3d 337, 346 (Tex. App.—Dallas 2022, no pet.)). In such a case, we skip straight to the parties' competing arguments about whether a TCPA exemption applies. *See id.*

As relevant here, under the TCPA's commercial-speech exemption, the TCPA does not apply to a claim against a person who is "primarily engaged in the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods, services . . . , or a commercial transaction in which the intended audience is an actual or potential buyer or customer." Tex. Civ. Prac. & Rem. Code Ann. § 27.010(a)(2). Four prongs must be met for this exemption to apply:

> (1) the defendant was primarily engaged in the business of selling or leasing goods [or services], (2) the defendant made the statement or engaged in the conduct on which the claim is based in the defendant's capacity as a seller or lessor of those goods or services, (3) the statement or conduct at issue arose out of a commercial transaction involving the

kind of goods or services the defendant provides, and (4) the intended audience of the statement or conduct were actual or potential customers of the defendant for the kind of goods or services the defendant provides.

*Castleman v. Internet Money Ltd.*, 546 S.W.3d 684, 688 (Tex. 2018).

### III. Standard of Review

We review de novo a trial court's denial of a TCPA motion. *Adams v. Starside Custom Builders*, LLC, 547 S.W.3d 890, 894 (Tex. 2018); *Montoya Frazier*, 2025 WL 494699, at *2; *Kawcak v. Antero Res. Corp.*, 582 S.W.3d 566, 571 (Tex. App.—Fort Worth 2019, pet. denied). In our review, we consider—in the light most favorable to the nonmovant—the pleadings and any evidence that a court could consider on summary judgment, including any submitted affidavits stating the facts on which the liability or defense is based. Tex. Civ. Prac. & Rem. Code Ann. § 27.006(a); *S&S Emergency Training Sols., Inc. v. Elliott*, 564 S.W.3d 843, 847 (Tex. 2018); *NexPoint Advisors*, 674 S.W.3d at 445.

### IV. Analysis

Zillow presents its appeal in a single issue: whether the trial court erred by denying its TCPA motion to dismiss. Under this issue, Zillow raises four sub-issues—three under the TCPA's three-part burden-shifting analysis and one regarding Zillow's claim for attorneys' fees and costs. The Bensons respond that the TCPA's

8

commercial-speech exemption applies and supports affirming the trial court's order denying Zillow's TCPA motion.[4] We agree with the Bensons.

We first address Zillow's overarching argument that because "the Bensons failed to submit a single piece of evidence that Zillow made the alleged statements[,] . . . the trial court would have erred had it relied on the commercial[-]speech exemption." Zillow, of course, did not file and could not have filed a no-evidence summary-judgment motion at this stage of the litigation. *See* Tex. R. Civ. P. 166a(i). Instead, it filed a TCPA motion, which requires us to view both the pleadings and evidence in the light most favorable to the Bensons. *See NexPoint Advisors*, 674 S.W.3d at 445; *Wells v. Crowell*, No. 05-20-01042-CV, 2021 WL 5998002, at *3 (Tex. App.—Dallas Dec. 20, 2021, no pet.) (mem. op.).

---

[4]At the outset, the Bensons argue that Zillow's failure to brief the commercial-speech exemption in its opening brief "dooms its appeal." *See, e.g.*, *Bair Hilty, P.C. v. J.B. Hunt Transp., Inc.*, No. 14-20-00659-CV, 2022 WL 1416661, at *3 (Tex. App.—Houston [14th Dist.] May 5, 2022, no pet.) (mem. op.) (affirming denial of TCPA motion because movant did not challenge on appeal the commercial-speech exemption's applicability). Zillow claims that it "necessarily argued" the issue in its step-one analysis simply by arguing that the TCPA applies. But Zillow goes on to brief the exemption in its reply brief and, "[t]o the extent necessary," alternatively seeks leave to file supplemental briefing. The supreme court has reiterated that we "retain authority to deem an unbriefed point waived in lieu of requesting additional briefing," but the court said so in the context of encouraging intermediate courts to decide appeals on the merits whenever reasonably possible. *See St. John Missionary Baptist Church v. Flakes*, 595 S.W.3d 211, 214–16 (Tex. 2020). Because in this case it is reasonably possible to decide the commercial-speech exemption's applicability, we will do so.

The Bensons' petition contains numerous allegations attributing the allegedly tortious and defamatory statements about the Property to Zillow. The Bensons also gave unsworn declarations attributing the alleged statements to Zillow. In addition, the Bensons provided an unsworn declaration from a search-engine expert, who determined that the statements at issue "originated with Zillow's website and not from any other source."

At this stage, the merits of the Bensons' claims are not before us, and Zillow cannot use the TCPA as an essentially out-of-the-gates no-evidence summary-judgment motion on liability and damages. Viewing the pleadings and evidence in the light most favorable to the Bensons—as we must at this stage—and without foreclosing the possibility that Zillow might eventually prevail on the merits, we turn to whether the commercial-speech exemption applies to Zillow's allegedly defamatory and tortious statements and conduct. *See NexPoint Advisors*, 674 S.W.3d at 445; *Wells*, 2021 WL 5998002, at *3.

## A.    Zillow's business of selling real-estate-marketplace services

Under the first commercial-speech-exemption prong, we examine whether Zillow was primarily engaged in the business of selling or leasing goods or services. As this court has previously observed, the TCPA does not define the term "services." *NexPoint Advisors*, 674 S.W.3d at 447. In *NexPoint Advisors*, this court looked at dictionary definitions of services, stating that it is defined to mean "work done by an organization or person that does not involve producing goods." *Id.* at 447–

10

48 (quoting *Service*, Britannica Dictionary, http://www.britannica.com/ dictionary/service (last visited May 14, 2025)). Additionally, the term can be defined as "economic commodities, such as banking, that are mainly intangible and usually consumed concurrently with their production." *Id.* at 448 (quoting *Services*, Dictionary.com, http://www.dictionary.com/browse/services (last visited May 14, 2025)).

Zillow is a self-described real-estate-marketplace company that provides information and services relating to selling, buying, renting, and financing real estate through its online platform. Zillow's business strategy "is intended to facilitate all components of the home buying, selling, and renting process, from initial property searches to closing to moving."

Zillow.com contains listings from individual agents and brokerages, MLSs, owners, and builders, as well as data from properties at auction, in pre-foreclosure, or that have already been foreclosed on. Zillow's website and mobile application provide its users with information and data related to available homes for sale, rentals, real-property-transaction history, estimated home-market values, home details, relevant matches, similar home-sales data, neighborhood information and tax information, among other information categories. As of 2023, Zillow had more than 160 million properties listed in its database—including the Property.

Zillow argues that because it was not the Property's direct seller, it was not selling or leasing goods or services under the TCPA. But Zillow's focus ignores its

11

own stated business strategy concerning the many real-estate-marketplace services that it offers and provides in connection with its online platform and real-estate listings, including the Property.

Consistent with its stated business strategy of facilitating home sales from property search to move in, Zillow's own video evidence about the Property showcases how that strategy was being implemented. Among other features—which are visible in the two videos Zillow provided—Zillow's website and mobile application enable users (1) to search through real-estate listings, (2) to search for a real-estate agent, and (3) to apply for and obtain financing from Zillow.

In listing the Property on its website, Zillow was not "speak[ing] of other . . . services in the marketplace"; it was speaking about its own real-estate-marketplace services—such as providing a realtor and financing—that it offered for those wanting to buy the Property. *See Castleman*, 546 S.W.3d at 688–89. We hold that the Bensons established that Zillow is primarily engaged in the business of selling real-estate-marketplace services and thus met *Castleman*'s first prong. *See id.*; *NexPoint Advisors*, 674 S.W.3d at 447–48.

## B.    Zillow's capacity as a seller of real-estate-marketplace services

The second commercial-speech-exemption prong requires us to determine if Zillow made the statement or engaged in the conduct on which the Bensons' claims are based—that is, by allegedly causing false information about the Property to appear

12

on Zillow's platform—in Zillow's capacity as a seller of real-estate-marketplace services. We hold that Zillow did.

The Bensons acknowledge that Zillow had an agreement with MLS to "pull[] information about the Propert[y] from MLS and place[] that information on the Zillow website." From the video evidence before us, the Property was listed for sale on Zillow's website as part of Zillow's efforts to encourage users to look at or tour the Property, to engage an agent to buy the Property, and to apply through Zillow's website for a mortgage to buy the Property.

One of the videos Zillow provided captured Bradina using her cellphone to search for the Property. When she keyed in the Property's address into the search engine DuckDuckGo, the very first link to appear is Zillow's listing of the Property.[5] When the user clicks on Zillow's link, the listing appears with the mansion's photo at the top of the screen. Beneath the photo is basic information about the Property, including the then-sales price. Below that information is an estimated monthly payment next to the words "Get pre-qualified," which clearly refers to Zillow's efforts to encourage users to pursue financing through Zillow. Indeed, the other video Zillow provided shows its home page, which advertises "Zillow Home Loans" and says

---

[5]The fact that Zillow's link appeared first among the search engine's results is not surprising based on the declaration of the Bensons' search-engine expert. According to the expert, Zillow performs search-engine optimization (SEO) to influence and control how its website is found and used. Using SEO enables Zillow to have its pages appear in search results and rank well so that consumers will easily find real-estate listings—and Zillow's related services—on Zillow's platform.

13

"Take advantage of lower rates . . . See how much you could save on your dream home by getting pre-qualified *with us* in as little as 3 minutes." [Emphasis supplied.]

The evidence demonstrates that Zillow wanted web users—its potential customers—to easily find its website so that it could then push its services to those users. Stated otherwise, through its business strategy Zillow stood to profit from the sale of the services it offered in connection with its listings, including the Property. *See VetMoves v. Lone Star Veterinarian Mobile Surgical Specialists, PC*, No. 02-19-00340-CV, 2020 WL 1887770, at *4 (Tex. App.—Fort Worth Apr. 16, 2020, no pet.) (mem. op.) ("The exemption applies when communications involve business pursuits for oneself or a business stands to profit from the statements at issue.") (cleaned up). Based on Zillow's pleadings and the evidence, we hold that in listing the Property on its platform, Zillow was acting in its capacity as a seller of real-estate-marketplace services and that the Bensons established *Castleman*'s second prong. *See* 546 S.W.3d at 688; *NexPoint Advisors*, 674 S.W.3d at 448.

## C.     The context of Zillow's statement or conduct at issue

Under *Castleman*'s third prong, the Bensons needed to establish that Zillow's statement or conduct at issue arose out of a commercial transaction involving the kind of services that Zillow provides. "A commercial transaction is generally a business deal." *NexPoint Advisors*, 674 S.W.3d at 448 (cleaned up). Notably, the commercial-speech exemption "does not require a completed transaction" and "can include conduct or statements that merely propose a commercial transaction." *Id.* at 448–

14

49 (first citing *Hieber v. Percheron Holdings, LLC*, 591 S.W.3d 208, 212 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); then citing *Castleman*, 546 S.W.3d at 690; and then citing *Rose v. Sci. Mach. & Welding, Inc.*, No. 03-18-00721-CV, 2019 WL 2588512, at *6 (Tex. App.—Austin June 25, 2019, no pet.) (mem. op.)).

As we discussed above, by listing the Property on its website through the use of SEO, Zillow intended for users searching for the Property to find the Property on Zillow's website above others, to look at the Property, and to then consider buying the Property through an agent listed on Zillow's website or with financing that Zillow offered.[6] Accordingly, we hold that the Bensons established that Zillow's conduct and statements regarding the Property proposed a commercial transaction and thus met *Castleman*'s third prong. *See* 546 S.W.3d at 690; *NexPoint Advisors*, 674 S.W.3d at 448–49.

## D.     The intended audience of Zillow's statement or conduct

Finally, we examine whether the intended audience of Zillow's statement or conduct in listing the Property with allegedly defamatory or tortious information consisted of Zillow's actual or potential customers for the kind of services it provides. As the evidence shows, Zillow's website users and the potential customers of its real-estate-marketplaces services were the intended audience of Zillow's alleged statements

---

[6]We observe that the Bensons' MLS listing indicates that the Bensons were also willing to seller finance the Property if a potential buyer provided a $5 million down payment. Zillow was thus directly competing in the market against the Bensons for the service of financing the Property's sale.

15

and conduct regarding the Property. To illustrate, because Zillow wanted its platform's users to finance potential home purchases through its company, it advertised that service on its home page and did so specifically in connection with the Property. We hold that the Bensons established the fourth *Castleman* commercial-speech-exemption prong. *See* 546 S.W.3d at 690; *NexPoint Advisors*, 674 S.W.3d at 449.

In sum, we conclude that (1) the Bensons established by a preponderance of the evidence the TCPA's commercial-speech exemption's applicability to their legal action against Zillow and (2) the trial court did not err by denying Zillow's TCPA motion. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.010(a)(2); *Castleman*, 546 S.W.3d at 688. We overrule Zillow's single issue.

## V. Conclusion

Having overruled Zillow's single issue, we affirm the trial court's order denying Zillow's TCPA motion[7] and remand this cause for further proceedings consistent with this opinion.

---

[7]Because we affirm the trial court's denial of Zillow's TCPA motion under the commercial-speech exemption, we need not decide Zillow's other sub-issues concerning the TCPA's three-part burden-shifting analysis or its request for attorneys' fees and costs in the event of a reversal of the trial court's order. *See* Tex. R. App. P. 47.1; *Stickland*, 2023 WL 8112889, at *15.

16

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: May 15, 2025